### A94A1069. PHELPS et al. v. HUFF.
(448 SE2d 64)

ANDREWS, Judge.

Mr. and Ms. Phelps, Mr. and Ms. Osborne, and McElroy, plaintiffs below and owners of property abutting that of Ms. Huff, defendant below, appeal from the judgment entered on the jury's verdict in Huff's favor regarding their joint boundary.

Viewed in favor of the verdict, the evidence was that all of the land involved was originally part of a 275-acre farm purchased by F. N. Carter in 1935. The farm consisted of seven 40-acre Land Lots. The land was divided among Carter's seven children in 1954, with Sarah Stubbs, the daughter of Carter and mother of Huff, receiving Land Lot 98 and Endicott, the predecessor in title of plaintiffs, receiving Land Lot 97, adjoining Land Lot 98 on the west. Endicott was a granddaughter of Carter and the niece of Sarah Stubbs.

In 1957, Endicott and Stubbs arranged to have the boundaries of Land Lots 97 and 98 surveyed by Robinson, the Paulding County surveyor. Robinson came to the property on April 29, 1957 and met Endicott and Stubbs. He surveyed Land Lot 97, including the line forming the common boundary of that lot and Land Lot 98. Robinson showed Endicott and Stubbs the iron pins he set in the corners forming the ends of that common line and, about midway up the line, a pin showing where the line crossed Willow Springs Road, which went

through both lots. Robinson testified that "those ladies both agreed on the line. They was satisfied with it before I left there."

On April 30, Robinson returned to survey the remaining three lines of Land Lot 98. Several of the Stubbs children, including William Stubbs, Huff's brother, and his wife Louise Stubbs came to the property to walk the lines with Robinson. Some of the men and boys carried iron pins and wooden stakes for Robinson and placed the stakes and pins every 100 feet on the lines until they ran out. The family members walked the entire perimeter of Land Lot 98 with Robinson. The two plats reflecting these surveys were recorded by Robinson on May 2, 1957.

In 1965, Ms. Stubbs signed a contract allowing timber to be cut from Lot 98. In connection with the timber cutting, Georgia Kraft had a survey run which showed the common boundary with Lot 97 to the east of Robinson's line.

In 1972, when Huff was preparing to build a home on part of Land Lot 98, Stubbs wrote a letter on her behalf to Endicott requesting that Endicott sign a boundary line agreement which reaffirmed the original corners of the joint line between Land Lots 97 and 98, per Robinson's survey. Endicott, an attorney, refused to sign the agreement, responding that she thought such an agreement unnecessary because "[a] boundary line is a boundary line, and that is it."

Mr. Huff placed part of a telephone pole inside the iron pin at the southwest corner of Land Lot 98 to remark the original line because the old pin was damaged.

In 1982, the Huffs had the small interior lot in Land Lot 98 containing their home surveyed by Cruselle. That plat reflects a distance of 200.97 feet to the western boundary of Land Lot 98, which is the Robinson line.

In 1984, Endicott was preparing to sell lots out of Land Lot 97 and wrote to real estate agent Lee, now deceased, on February 18 concerning a proposed listing of her property with Lee's employer, Cherokee Properties. In that letter, Endicott discussed her awareness of a line dispute and states that, in 1957 when Robinson surveyed Land Lot 97, "he also surveyed lot number ninety-eight, which at that time belonged to Mrs. Bill Huff's mother, Mrs. Sarah Stubbs, who was my aunt. She and I were both present at the time of the survey and we both agreed with Robinson as to the property lines and accepted his survey as correct. The same agreeing with the one on record in the courthouse at that time."[1]

In 1984, the Camps bought the southwestern portion of Land Lot 98 from Huff, including the Huff home. The Camps' survey was done

---

[1] This "original survey" was not introduced at the trial.

on May 14, 1984 by LSI Surveys and used a line to the east of Robinson's as the western boundary of their portion of Lot 98.

Surveyor Knight was asked by the real estate company to survey the outer boundaries of Land Lot 97 in preparation for Endicott's subdividing and sale of portions of this lot. On his plat, dated May 25, 1984, Knight located the common boundary line with Land Lot 98 approximately 35 to 45 feet to the east of Robinson's line, cutting off approximately an acre from Huff's property and including it in Endicott's. Knight did not reference the Robinson line or the Georgia Kraft line, indicating only the line he surveyed. His line was consistent with the Georgia Kraft line.

On June 10, 1984, Cruselle, now working for LSI, surveyed all of Land Lot 98 for the four Stubbs children who had split up Sarah Stubbs' property after her death. In this survey, Cruselle reflected two western lines of Land Lot 98, indicating the Robinson line and what Cruselle said in his opinion was the true line, to the east of the Robinson line. This second line was the Georgia Kraft-Knight line.

Endicott sold that portion of Land Lot 97 abutting Land Lot 98 to the Phelpses, Osbornes, and McElroy. They made claims to the disputed area between the Robinson and Knight lines which were first addressed by Huff in 1988 when her attorney wrote letters claiming the Robinson line as the true line. A driveway was blazed and concrete poured on the disputed tract by the Phelpses and Osbornes. When Huff had the land resurveyed and marked consistently with the Robinson line and began preparations to build a fence, plaintiffs obtained a restraining order and initiated this litigation. Huff counterclaimed for damages due to the cutting of some of her trees and the fact the driveway would have to be removed. The verdict was for Huff on the issue of location of the line and for plaintiffs on Huff's counterclaim.

1. Appellants' first enumeration is that the court erred in allowing into evidence defendant's exhibit no. 23, Endicott's letter to Lee, quoted above, "which contained hearsay."

Lee was deceased at the time of trial and Endicott was not competent to testify due to age and ill health. Lee's employer testified that he had located the letter in his files. Huff identified the signature on the letter as Endicott's.

Prior to trial, appellants filed a motion in limine contending that defendant's exhibit no. 23 was hearsay or in violation of former Ga. Code Ann. § 38-1603 ("Deadman's statute," which was revamped by Ga. L. 1979, p. 1261). The latter ground was not raised when the letter was introduced into evidence and is not argued here.

Although other bases for objecting to the letter are argued in the brief, we consider only the hearsay ground which is contained in the enumeration of error. *Batten v. Chrysler Corp.*, 211 Ga. App. 173, 175

(2) (438 SE2d 647) (1993).

OCGA § 24-3-13 provides that "[t]raditional evidence as to ancient boundaries and landmarks shall be admissible in evidence, the weight to be determined by the jury according to the source from which it comes." Such evidence is an exception to the hearsay rule. *Gilman Paper Co. v. James*, 235 Ga. 348, 351 (219 SE2d 447) (1975); *Deaton v. Swanson*, 196 Ga. 833, 837 (3, 4) (28 SE2d 126) (1943); *Waddell v. Cole*, 138 Ga. App. 15 (2) (225 SE2d 491) (1976); (oral declarations of deceased predecessors in title or other witnesses as to line location admissible); see *Shuman v. State*, 84 Ga. App. 585, 587 (2) (66 SE2d 152) (1951).

The letter was properly admitted.

2. In their second enumeration, plaintiffs contend that the admission of opinion testimony by a surveyor and a real estate attorney was error.

Huff contended that the boundary line was established by acquiescence in 1957 when she and Endicott agreed to the line pointed out to them by Robinson, OCGA § 44-4-6; *Young v. Griffin Lumber Co.*, 200 Ga. App. 692, 694 (2) (409 SE2d 264) (1991), or that the Huffs had gained title to the disputed property by adverse possession up to the Robinson line, OCGA § 44-4-7.

(a) Tibbets, a registered surveyor, was retained in 1991 by the Huffs to prepare a plat reflecting the location of the contested lines between Land Lots 97 and 98. On his survey, he reflects the Robinson line and the Kraft-Knight-Cruselle line. He testified and, during direct examination by the Huffs, was asked if "in your understanding of the law of surveying, does the surveyor have the authority to establish a property line? A. Not in the case of an already established property line. . . . *The only time a surveyor has authority to establish a property line is in the case of a new parcel — creating a new parcel of land.*" (Emphasis supplied.) No objection was made to this testimony by plaintiffs.

On cross-examination by plaintiffs, Tibbets was again asked about this subject and responded that a surveyor could establish a line for a property owner "[i]n the case of a subdivision or a property line agreement."

On redirect, Tibbets was asked a hypothetical question based on the facts as to whether, if a dividing line had not been previously surveyed, the adjoining owners were present, shown the line surveyed that day by Robinson, and accepted his survey as correct, "as a surveyor, based on your knowledge and understanding, in your opinion, did [he] establish the common line between the adjoining landowners." He answered affirmatively.

This hypothetical question was objected to on the basis that it called for a legal opinion involving the ultimate issue for the jury and

was based on facts not in evidence. There is no basis for this latter ground.

"Where a party fails to object to certain inadmissible evidence, but later objects to substantially the same evidence, the objection should be overruled because the failure to object the first time makes this harmless error. [Cit.]" *Steverson v. Hosp. Auth. of Ware County*, 129 Ga. App. 510, 514 (2) (a) (199 SE2d 881) (1973). *Dept. of Transp. v. Coley*, 184 Ga. App. 206, 207 (1) (a) (360 SE2d 924) (1987). Having allowed Tibbets to repeatedly testify that a surveyor, with agreement of the owners, could establish a line in a previously unsurveyed area, the objection to the hypothetical was too late. Id.

Additionally, Tibbets' opinion was not a legal one but one of fact based on his knowledge and practice of the profession of surveying and the effect, as far as a surveyor was concerned, of agreement by adjoining property owners as to the location of a line which had never been surveyed before. "Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman." *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981). See *Lawhorne v. Soltis*, 259 Ga. 502, 504 (2) (384 SE2d 662) (1989).

(b) Attorney Benson had been retained by the Stubbs' children to do a title search of Land Lot 98 in 1983, before the Knight survey. He examined the Robinson plat as part of this search and noted no dispute of record as to the location of the western line of Land Lot 98 at that time.

In 1987, he was contacted by Endicott and Huff about their concern that another survey had placed the line in a different location. In 1988, he wrote letters advising the plaintiffs of Huff's contention.

On direct examination by Huff, Benson affirmatively answered the following hypothetical question: "[a]ssume that in [1957], . . . Endicott and . . . Stubbs, engaged . . . Robinson, to survey their land, and assume that both . . . agreed with [him] as to the property line and accepted his survey as correct; assume that, *in your opinion, as a lawyer*, would the line as located . . . be the property line between the adjoining owners?" (Emphasis supplied.) Plaintiffs objected, contending it called for a "legal conclusion."[2]

*Bishop v. Lamkin*, 221 Ga. 687, 689 (146 SE2d 772) (1966), was an action to enjoin a continuing trespass over a 20-foot strip of plaintiff's property. As stated therein, "[a]gainst the contentions of the

---

[2] Although Benson did answer the question before the objection was voiced, the objection was immediate and we find it timely.

plaintiff that he is the owner of the property on which the alleged trespass occurred, the defendants allege and contend the strip of land . . . was owned by another with the right of user in . . . Bishop by deed. This, of course, is a part of the ultimate fact to be determined by the jury, and whether or not an attorney at law may qualify and testify as an expert witness as to what the law is and who has title and owns property as found by him from examination of title records under [OCGA § 24-9-67], the testimony here of the title attorney that he found the title of the 20-foot strip to be in Holmes with right of user in Bishop was a part of the ultimate fact to be decided by the jury."

Here, after the objection was made, the trial court initially stated that "the question is actually not what the law is but where the land line is. And two people were there, and the surveyor says, 'This is where I find the line is,' that's not a question of law. That's a question of fact." After further discussion of the "ultimate fact" issue, the court stated "I don't think they [the jury] have to take the opinion, sort of second-handed, that the lawyer gave that it is the real line, but he [the surveyor] is there, and both sides agree that that's the line, that's it."

Benson's opinion, "as a lawyer," can only be interpreted as his opinion that this agreement would establish the line as a matter of law, which, with adequate instruction from the court, was the jury's responsibility. See *Bishop*, supra.

" 'To allow testimony of this kind, would be to allow a witness to testify what the law is. Witnesses must testify to facts, and the court is responsible for the law.' [Cit.]" *Taylor v. State*, 204 Ga. App. 489 (3) (419 SE2d 745) (1992). See *Nichols v. State*, 177 Ga. App. 689, 693 (2) (340 SE2d 654) (1986); *Gage v. Tiffin Motor Homes*, 153 Ga. App. 704, 707 (2) (266 SE2d 345) (1980).

This, however, does not end the inquiry. Here, the trial court fully instructed the jury that the determination of whether the property line had been established under the legal theory of acquiescence or adverse possession was theirs. They were also instructed that the credibility of the witnesses and the weight of the evidence were for their determination. Therefore, this error was not harmful. *Dept. of Transp. v. Franco's Pizza &c.*, 200 Ga. App. 723, 726 (2) (409 SE2d 281) (1991); see *Taylor*, supra at 490 (3).

3. Finally, plaintiffs allege error in the court's giving of Huff's Requests to Charge Nos. 10 and 16.

Although Huff's Request No. 16 was discussed during the charge conference, after the charge was given and the court asked for objections, the only objection made by plaintiffs was to Request No. 10 and that is all we consider. *Jackson v. Lynch*, 203 Ga. App. 244, 246 (2) (416 SE2d 564) (1992).

As to Request No. 10,[3] after the charge was given, the objection stated was that "the court charged . . . [No. 10] which we think was error, and we explained why earlier." The objection voiced during the charge conference was that "I think ten is a little confusing. It talks about two different things. One is acquiescence, and the other is a degree line."

Assuming without deciding that the broad objection voiced was adequate to preserve any error, *T & M Investments v. Jackson*, 206 Ga. App. 218, 222 (8) (425 SE2d 300) (1992), we find no error. *Peacock v. Boatright*, 221 Ga. 661, 663 (1) (146 SE2d 745) (1966); *Young*, supra at 693 (1) & (2).

*Judgment affirmed. Beasley, P. J., and Johnson, J., concur.*

DECIDED AUGUST 12, 1994.

*Jeffrey B. Talley*, for appellants.
*Smith & Diment, Dana G. Diment*, for appellee.

---

[3] The charge was that "[w]here the owners of adjoining property agree upon a line as dividing their property and they acquiesce in that line either by acts or by declarations, that line becomes the fixed boundary between the properties; whether it is the original land line makes no difference. The agreed upon line is the true line between them. Further, when an oral agreement is made and executed, it is binding upon all purchasers of that land."