A00A0120. TIME WARNER ENTERTAINMENT COMPANY, L.P. et al. v. SIX FLAGS OVER GEORGIA, LLC et al.

(537 SE2d 397)

ELLINGTON, Judge.

This appeal is from a jury verdict in favor of a limited partnership and its sole limited partner against the general partner which from 1991 through 1998 operated the partnership's business investment, the Six Flags Over Georgia theme park. Appellee Six Flags Over Georgia, LLC ("Flags") is the limited partnership which owns the park. Appellee Six Flags Fund, Ltd., L.P. ("Fund") is the partnership's sole limited partner and is comprised of individual investors.[1] Although appellant Six Flags Over Georgia, Inc. ("SFOG") was the named general partner corporate entity responsible for operating the park, appellees alleged that Time Warner Entertainment Company, L.P. ("TWE"), acting through and in concert with its subsidiaries SFOG, Six Flags Entertainment Corporation ("SFEC"), and Six Flags Theme Parks, Inc. ("SFTP"), assumed the role of general partner and directed the activities of the partnership. The complaint[2] alleged, in essence, that the general partner damaged the appellees by preferring its own financial interest over that of the partnership and of the limited partner. The jury returned a verdict in favor of the appellees, awarding a total of $197,296,000 in compensatory damages and $257,000,000 in punitive damages.[3] Appellants contend they are

---

[2] *Zamora v. State,* 226 Ga. App. 105 (485 SE2d 214) (1997).

[1] Appellee Six Flags Claims Trust is not a limited partner and was awarded no damages. It was created solely to fund the litigation and handle any proceeds of the litigation.

[2] The complaint set forth counts for breach of fiduciary duty, conversion, fraud, breach of contract, conspiracy to breach contractual obligations, and for an accounting. Of the claims actually submitted to it (breach of fiduciary duty, conversion, and breach of contract), the jury found in favor of appellees on the breach of fiduciary duty claim only.

[3] The jury found that each of the appellants breached the fiduciary duty owed Fund and awarded it $149,175,000 in compensatory damages. The jury also found that each of the

entitled to a new trial because (1) the trial court should have directed a verdict in favor of certain "non-partner defendants"; (2) the court should have directed a verdict in appellants' favor on appellees' "capital improvements" claim; (3) the evidence of breach of fiduciary duty was insufficient to support the jury's verdict; (4) the court erred in admitting or excluding certain evidence; (5) the court impermissibly impugned defense witnesses in the jury's presence; (6) the court erred in giving certain jury charges; (7) compensatory damages were either speculative or excessive; and (8) punitive damages were either unwarranted or excessive. Finding no reversible error, we affirm.

Viewed in the light most favorable to support the jury's verdict, the record reveals the following relevant facts: Flags, the partnership which owns the Six Flags Over Georgia theme park, has existed since 1967. The park, much like its sister park in Texas, was developed as a limited partnership comprised of a limited partner investor and a general partner park operator. The rights and responsibilities of the partners were set out in a written agreement which was amended in 1973. The agreement provided that the general partner had "exclusive control of the management of the business and affairs of the limited partnership" and would receive, among other compensation, 70 percent of the park's net cash flow. The partnership agreement also required the general partner to make certain "minimum" capital improvements each year. The 30-year partnership agreement expired on December 31, 1997. When the agreement ended, ownership of the park reverted wholly to the limited partner, Fund, which could then elect to sell the park or to entertain bids from prospective general partners that wished to enter a new partnership agreement. Appellees' principal witness, Avram Salkin, a Fund investor and signatory on the partnership agreement, has acted as Fund's representative for the last 30 years.

In 1990, TWE executives investigated acquiring all seven of the Six Flags theme parks and marketing them as "a national brand." In 1990, TWE bought nineteen percent, with an option to buy an additional thirty percent, of the stock of Six Flags Corporation (SFTP's predecessor), the company which owned five of the Six Flags theme parks and controlled the Georgia and Texas parks' general partner corporations. TWE executive Bob Pittman, the "architect" of the Six Flags deal, pitched the idea of acquiring Six Flags Corporation to the

---

appellants breached the fiduciary duty owed Flags and awarded it $48,121,000 in compensatory damages. The jury, finding that each of the appellants acted with a specific intent to harm, awarded punitive damages as follows: from TWE, $183,750,000 to Fund and $61,250,000 to Flags; from SFEC, $6,000,000 to Fund and $2,000,000 to Flags; from SFTP, $2,250,000 to Fund and $750,000 to Flags; from SFOG, $750,000 to Fund and $250,000 to Flags.

Time Warner, Inc. Board of Directors in July 1991. On December 26, 1991, TWE exercised its option and bought a controlling interest in SFTP, which owned SFOG, the named general partner of the Georgia park. Pittman, who was president of Time Warner Enterprises, a division of TWE, then became chairman of the board and CEO of SFEC, the TWE subsidiary which owned SFTP. He held those positions until 1995 when he left TWE for America Online. Pittman admitted that "as president of Time Warner Enterprises or Six Flags Entertainment, we were making decisions about the Georgia Park."

As early as February 19, 1991, months before TWE acquired controlling interest in the parks, Pittman began negotiating with the Coca-Cola Company to sell it the exclusive right to market Coca-Cola products at all seven Six Flags theme parks. A confidential agreement dated November 27, 1991, made the Coca-Cola deal contingent upon TWE acquiring a controlling interest in SFTP. The agreement was signed by Pittman as CEO of Time Warner Enterprises and by a Coca-Cola executive. In exchange for the promised sale of these rights, TWE received a one-time $20 million "sponsorship fee" or "marketing advance." On December 26, 1991, TWE used these funds and funds from other sources to exercise its option and buy the additional 30 percent of SFTP stock and controlling interest of the company. On that same date, Coca-Cola and SFEC executed a final marketing agreement. Salkin was not informed that this Flags asset had been sold until 1995, and when he asked to see the Coca-Cola agreement, he was told it was confidential. Flags never received its $2.8 million share of the $20 million fee.

In April 1992, Salkin was invited to meet with Pittman and other TWE and SFEC executives. Pittman immediately wanted to discuss buying out the Georgia theme park. Of course, Salkin could not simply negotiate a sale; he was required by his agreement with Fund investors to "shop" the park to the highest bidder when the partnership agreement expired. When TWE, Flags, and Fund representatives met again in October 1992, Pittman presented a $150 million plan for the Georgia park which included building a hotel and an island. According to Salkin, however, Pittman conditioned the plan upon "some type of a deal," and hinted that if Fund and Flags did not cooperate, TWE would build a competing park and would not make capital investments in new thrill rides for the Georgia park. Salkin said Pittman told him that TWE was "not interested in being in the business of managing assets for others."

A year after this meeting, Time Warner, Inc. executives contacted a real estate broker with Cushman & Wakefield's Atlanta office to discuss acquiring land in Georgia. Although the broker met with a Time Warner, Inc. executive, he was retained by SFTP to purchase land as a nominee and to keep the name of the actual buyer

confidential. The broker's commissions were paid by SFTP. He was not authorized to discuss any of the land transactions with Salkin or representatives of Fund or Flags.

The broker acquired 13.7 acres of land immediately adjacent to the Georgia park for $1.8 million. On behalf of Time Warner, Inc., the closing papers were signed by Senior Vice President Paul McNicol. The purchase of this property effectively bounded the Six Flags theme park between the Time Warner, Inc. parcels, the Chattahoochee River, and Interstate 20, thus limiting the park's expansion opportunities. The broker was also later told to find a 600- to 700-acre tract of land 40-60 miles from Atlanta and to refer to the project as the "Pennants Theme Park." On June 30, 1994, the broker went on a helicopter ride with Pittman and SFTP and SFOG executives to view land meeting the project criteria. The helicopter ride was paid for by Time Warner, Inc. and categorized as an expense for "development of [a] new park." Time Warner, Inc. authorized the broker to make offers on the land, which he did. Almost a year later, after negotiating potential sales and faxing counteroffers to Time Warner, Inc.'s lawyers, the broker was told to cease his efforts.

During this time, TWE also studied the feasibility of developing a competing park. Stephen Ross, Bob Daly, and Terry Semel — executives with TWE's Warner Brothers division, who in April 1995 succeeded Pittman as the primary decision-makers for the general partner — hired Harrison Price Company to evaluate building a theme park within 100 miles of Atlanta. The evaluation was done using confidential business information from the Six Flags Over Georgia park. Although no competing theme park was ever built, TWE executives did draft a plan dated October 2, 1996, which outlined spending $12 million on capital improvements for the proposed park every third year and $5 million for each of the two years in between. From 1991 through 1996, TWE never caused during any one year $5 million to be spent on capital improvements at the Georgia park, even though all capital expenditures would come from the park's surplus operating cash.

In late 1995 and early 1996, Salkin began the task of shopping the park by visiting competitors' theme parks to evaluate them as prospective bidders for general partner. According to Salkin, he learned that major capital investments, particularly in new thrill rides, was the key factor that drove attendance and profits at the parks. When Salkin toured the Georgia park in May 1996, he discovered that the park's operators had been asking the general partner to install an inverted roller coaster, "Batman the Ride," since 1992. Salkin, however, had been told by TWE executive Ross that the Georgia park would not get the coaster in 1996 because park management had agreed that the Olympics would adversely impact park attend-

ance that year. The park operators told Salkin that, although they were concerned about the impact of the Olympics, this did not change their desire to add the Batman coaster to the park and stated that they were trying on their own to find a way to market the park during the Olympics. Salkin also testified that Flags had been overcharged for the old but refurbished Viper roller coaster ride which had been installed in 1992. Further, there was evidence that the Georgia park had substantial "deferred maintenance" and needed between $7 and $10 million in basic repair. Salkin also discovered that TWE had been signing key park executives, including SFOG President John Bemet, to employment contracts with TWE that became effective when the partnership ended. Salkin testified that the contracts provided that the employee would not compete against TWE, would not disclose business information to anyone, including Fund and Flags representatives, and would not assist anyone in litigation against TWE.

On June 7, 1996, Salkin and his attorney wrote TWE and SFTP executives and informed them that, if they could not reach an agreement to install Batman the Ride in the Georgia park before the opening of the 1997 season, negotiations with TWE for the general partnership would be deferred. Ten days later, Salkin met with TWE executives Ross and Daly and discussed his grievances. On August 1, 1996, TWE agreed to install Batman the Ride, to transfer land adjacent to the park to Flags, to stop signing park employees to TWE contracts, and to reserve to Fund and Flags any claims each might bring against TWE in future litigation. Consequently, later that month, TWE's Warner Brothers division was allowed to bid for the general partnership. According to Salkin, TWE pledged to build "rides, rides, rides," investing significant amounts in capital improvements, and promised that it was in the amusement park business "to stay." Because TWE made the best offer for the park, Fund selected it to continue as general partner. The parties estimate the present value of the new 30-year partnership agreement at between $286 million and $300 million. On March 19, 1997, the day after the new partnership agreement was executed, SFOG and SFTP sued Salkin and Fund, seeking to resolve those claims which Fund and Flags had previously reserved. The trial court, by consent order, realigned and added parties, and this litigation ensued. Less than a year later, TWE sold all seven of the Six Flags theme parks to Premier Parks, Inc. as a "package deal" for $1.9 billion, resulting in earnings to TWE of approximately $453 million.

Appellees' contention was that TWE intended to buy the Georgia park outright and, if it could not, it planned to use its position as general partner to deliberately underinvest in the park to depress its value. According to appellees, TWE's plan was to deter prospective

competing bidders and allow TWE to purchase the park or secure the general partnership at reduced cost at the end of 1997. And, because it was in TWE's financial interest to sell all seven of the Six Flags parks as a package, appellees contended TWE intended to get long-term control of both partnership parks.

To establish these claims, Fund and Flags adduced evidence explaining how amusement parks are typically invested in, valued, and sold. The evidence showed that amusement parks are sold (or management contracts are based) on a multiple of park earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Capital investment in an amusement park, especially in major thrill rides, fuels EBITDA growth, which in turn increases the value of the park. Conversely, low or modest capital investment keeps amusement park earnings and growth flat and the park's value depressed.

Other evidence from TWE's own internal documents showed that once it got control of the Six Flags theme parks, it planned to spend considerably less on the Georgia park than on any of its wholly owned parks. For example, a September 1991 confidential memorandum revealed a plan to make "10 percent annual increases in spending at each of the owned parks and a consistent decline in spending at the partnership parks as their agreements with the company approach their expiration date." As TWE later demonstrated in a slide show presentation to its executives entitled "Six Flags Strategic Choices," the plan to lower capital expenditures was a choice, using their own word, to "milk" the park as part of an overall strategy to "eventually sell pieces or [the] whole business."

TWE documents also revealed that TWE did, in fact, invest considerably less in the Georgia park as compared to the wholly owned parks. Evidence was produced that TWE consistently installed new thrill rides in its wholly owned parks, following a "major/minor plan" to make large capital investments in a major attraction every second or third year followed by a minor new attraction in the year or years in between. During TWE's seven-year tenure as general partner of the Georgia park, however, the only thrill ride it voluntarily installed was 1992's Viper roller coaster, a 20-year-old traditional coaster which had been removed from the Chicago park to make room there for Batman the Ride. The Viper was considered a minor capital expenditure and a minor new attraction. Each of the owned parks, however, received major new rides every second or third year. And, by 1995, four out of the five wholly owned parks had received Batman the Ride, an inverted coaster, which significantly increased EBITDA at each of those parks. Salkin testified that, after Batman the Ride was installed in Georgia, the park's value increased by 40 percent and pushed its EBITDA to $28 million. Salkin further testified that if the Georgia park had gotten Batman the Ride in 1995 and

another major attraction in 1997, the park's EBITDA would have risen to approximately $40.7 million, giving it an estimated value in the $500 to $600 million range.

In fact, there was evidence that Batman the Ride had been purchased specifically for the Georgia park's 1995 season, but it was diverted to TWE's wholly owned St. Louis park because, according to notes from a July 12, 1995 meeting at Warner Brothers Studios between TWE and its business partners, "despite the quick return [on investment], putting an inverted coaster into the [Georgia] Park could increase the limited partner's leverage in negotiating with other potential strategic partners in 1998 and beyond." Consequently, TWE's installation of the coaster would be "subject to a deal with the limited partners." There was evidence that the Olympics were never a factor in TWE's decision to delay installation of the ride and that installation of a major ride in the Texas partnership park was also delayed until a deal with TWE was reached.

In addition to evidence that TWE withheld capital expenditures on major attractions in the Georgia park, evidence was also produced that it withheld or distorted requested financial information necessary for Fund and Flags to adequately assess the park's performance and value. In fact, Salkin testified that he stopped receiving detailed monthly financial reports when he started to shop the park in 1995. Salkin said he repeatedly requested data on the park's value and performance, the effect of coasters on EBITDA, the level of capital expenditures, and the park's projected future value and performance, but he received only scant and incomplete information. Fund did not receive a 30-year projection showing, by TWE's own estimation, that the present value of the Georgia park was close to $600 million. There was evidence that TWE did not divulge this information because it wanted to induce Fund to choose from TWE's bid proposals an arrangement with a higher annual payment and a smaller percentage of profits. Without the information he requested, Salkin testified he could not adequately evaluate the proposals received from other bidders or from TWE. Moreover, there was evidence that the competing bidders, having only the information Salkin had, were induced to make conservative, and consequently losing, bids for the general partnership.

Appellees' expert, a management consultant in the theme park industry, testified about what a prospective bidder was warranted in investing in the Six Flags Over Georgia theme park. He opined that the park was "under-invested," "not keeping pace," and "suffering" compared to comparable parks. Further, in a time when Atlanta's population and economy were growing much faster than that of the other Six Flags cities, the Georgia park should have been able to capture the market in 1997 and generate $100 million instead of the

$87.8 million it brought in. Using a conservative 10.7 multiple of EBITDA, the expert opined that the Georgia park, had it been properly managed and invested, would warrant an investment of about $442 million in 1998. Using the higher 13.6 multiple of EBITDA that TWE actually used in its sale of all seven Six Flags theme parks to Premier Parks in 1998, the warranted investment could have been as high as $560 million.

Appellees also presented evidence showing that TWE charged Flags for expenses that were not allowed under the partnership agreement. TWE charged over $4 million of its corporate expenses — for example, executive lunches at New York's Tavern on the Green and luxury automobiles for TWE executives — to the partnership. TWE also overcharged Flags for the Viper roller coaster by almost $1.4 million. Adding these damages to those attributed to the lost Coca-Cola fee, lost park income, and lost park value, appellees' damages expert estimated that Fund and Flags together suffered $239,363,642 in economic damages over the years appellants acted as general partner.

1. In three enumerations of error, appellants argue the trial court should have directed a verdict or judgment notwithstanding the verdict with respect to certain defendants and claims. A directed verdict is appropriate "only if there is no conflict in the evidence as to any material issue and the evidence introduced, construed most favorably to the party opposing the motion, demands a particular verdict. OCGA § 9-11-50 (a)." *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1) (508 SE2d 646) (1998). The same standard also applies to our review of the trial court's decision to deny appellants judgment n.o.v. Id.

(a) Appellants contend the evidence adduced was insufficient to support the jury's finding that they breached the fiduciary duty owed Fund and Flags. We disagree.

Fiduciary duties and obligations are owed by those in confidential relationships, that is, relationships "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58. See *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 606 (1) (503 SE2d 278) (1998). Appellants admitted and the evidence shows that SFOG was a general partner with such fiduciary duties. Moreover, as for the reasons set forth in Division 1 (b), TWE, SFTP, and SFEC were also liable for any breach of SFOG's fiduciary duty.

We conclude that the evidence, viewed in the light most favorable to the jury's verdict, showed that appellants engaged in self-dealing conduct that specifically harmed appellees. For example,

appellants kept secret profits derived from the sale of a partnership asset, the exclusive right to sell Coca-Cola products in the park. This was a breach of fiduciary duty. See *Franco v. Stein Steel &c. Co.*, 227 Ga. 92, 95 (1) (179 SE2d 88) (1970); see also OCGA § 14-8-21 ("Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from . . . any use by him of its property."). There was also evidence which could support the conclusion that the general partner engaged in self-dealing by depressing the value of the park by underinvesting in it and then withholding information so that it could acquire the park at a discount. This was also a breach of fiduciary duty. See *Ledbetter v. Ledbetter*, 222 Ga. App. 858, 861 (1) (476 SE2d 626) (1996); see 59A AmJur2d, Partnerships, § 443. Because the evidence supports the jury's verdict, we will not disturb it.

(b) Appellants contend the trial court should have directed a verdict in favor of "non-partner defendants" TWE, SFTP, and SFEC because only the subsidiary SFOG, as the named general partner corporate entity, owed Fund and Flags a fiduciary duty. We cannot agree.

Appellants' argument is founded upon the premise that appellees failed to adduce evidence imputing liability to TWE, SFTP, and SFEC, the parent corporations, for subsidiary SFOG's acts under alter ego, agency, or joint venture theories. However, whether the parent corporations were vicariously liable under any of these theories for SFOG's acts was not the main basis of liability argued below. Rather, the appellees argued at trial, as they do now on appeal, that the parent corporations aided and abetted SFOG in a breach of its fiduciary duties.

Although this court has never explicitly recognized a cause of action for aiding and abetting a breach of fiduciary duty, see *Munford v. Valuation Research Corp.*, 98 F3d 604, 613 (11th Cir. 1996), we have at least twice implicitly acknowledged that such claims are viable. See *Williams v. Svc. Corp.*, 218 Ga. App. 10 (459 SE2d 621) (1995), and *U3S Corp. v. Parker*, 202 Ga. App. 374, 380 (4) (414 SE2d 513) (1991) ("issues remain to be tried" on the count alleging two defendants "aided and abetted the other two defendants' breach of fiduciary duty"). We have explicitly "acknowledged an aiding and abetting cause of action in torts involving violence, the sale of unregistered securities, breaches of covenants with employment contracts, and fraudulent conveyances." *Munford v. Valuation Research Corp.*, 98 F3d at 613. And, we have also recognized an aiding and abetting cause of action in many cases involving the misapplication of trust funds. See, e.g., *Adams v. McGehee*, 211 Ga. 498, 500 (4) (86 SE2d 525) (1955). Further, other jurisdictions have specifically found that such a cause of action is implicit in their existing case law gov-

erning the liability of persons acting in concert. See, e.g., *Granewich v. Harding*, 329 Ore. 47, 54-58 (985 P2d 788) (1999); *Holmes v. Young*, 885 P2d 305 (Colo. App. 1994). Were we required to address this issue, we could follow suit, finding that such a basis for liability is implicit in OCGA § 51-12-30, pertaining to the joint liability of one who procures an actionable wrong. However, because appellants conceded an aiding and abetting theory of liability for breach of fiduciary duty claims at trial, error, if any, was induced. Moreover, because appellants have not enumerated as error the jury's finding of liability on this theory, we lack jurisdiction to consider it.

Appellants' Request to Charge No. 39, entitled "Liability of Other Defendants," specifically contained as one of three alternate bases of liability that "Defendant SFOG, Inc. was substantially aided by another Defendant." Further, after the trial court charged the jury with respect to one who "aids or assists" in a breach of fiduciary duties, appellants' counsel failed to except to the charge on the ground that Georgia law does not recognize a claim for aiding a breach of fiduciary duties. Instead, counsel complained only that the trial court did not insert the word "substantially" before "aids." Appellants have not enumerated the giving of this charge as error or the jury's finding of liability on this basis as error.

"It is well settled that a party cannot complain of an appellate ruling, order, or judgment that his own legal strategy, litigative procedure, or conduct aided in causing." (Citations omitted.) *Strong v. Wachovia Bank*, 215 Ga. App. 572, 573 (2) (451 SE2d 524) (1994). Moreover, this court lacks jurisdiction to consider inadequately enumerated grounds. OCGA § 5-6-40; *Meeks v. State*, 178 Ga. App. 9, 14 (4) (341 SE2d 880) (1986). Consequently, we will not address the validity of this basis for liability but note only that if we did, the evidence adduced supports the jury's finding that appellants aided and abetted SFOG in a breach of fiduciary duty to Fund and Flags. See *Holmes v. Young*, 885 P2d at 309.

(c) Appellants also contend the trial court erred in denying their motion for judgment n.o.v. on appellees' "capital improvements claims." Appellants argue that because the "Capital Improvements" provision of the partnership agreement required the general partner to spend at least $800,000 per year on capital improvements, and because appellants spent well in excess of that, they satisfied their capital improvement obligations to the partnership and the limited partner and consequently cannot be held liable for breaching their fiduciary duty to make capital improvements. See *Westminster Properties v. Atlanta Assoc.*, 250 Ga. 841, 842-843 (1) (301 SE2d 636) (1983).

Addressing these contentions required that the partnership agreement be construed to determine the general partner's obligations with respect to making capital improvements. In this case, the

trial court submitted the partnership agreement to the jury without construing it.[4] Although the court has a duty to construe contracts submitted to it, a new trial will not be granted where the contract is submitted to the jury and properly construed by it. *South Ga. Trust Co. v. Neal*, 174 Ga. 24 (2) (161 SE 815) (1931). As explained below, we find that the partnership agreement required the general partner to make discretionary decisions in good faith as to the amount and type of capital improvements and that there was evidence sufficient to support the conclusion that the general partner breached a duty to act in good faith in making these decisions. Because the jury verdict was consistent with this construction of the partnership agreement and with a finding that the general partner in concert with the other appellants acted in bad faith, we find no error.

"An issue of contract construction is at the outset a question of law for the court." *Grier v. Brogdon*, 234 Ga. App. 79, 80 (2) (505 SE2d 512) (1998). The first step is to look to the four corners of the instrument to determine the meaning of the agreement from the language employed. *Terry v. State Farm &c. Ins. Co.*, 269 Ga. 777, 778-779 (2) (504 SE2d 194) (1998). If the contract language is ambiguous, however, then the court must apply the applicable rules of construction. *Grier v. Brogdon*, 234 Ga. App. at 80; OCGA § 13-2-2. "The cardinal rule of contract construction is to ascertain the intention of the parties." (Punctuation omitted.) *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 242 (1) (503 SE2d 877) (1998); OCGA § 13-2-3. If, after applying the rules of construction, the language remains ambiguous, then the finder of fact must resolve the ambiguity. See id.

The contract provision at issue sets a capital improvements "minimum," a floor beneath which spending on capital improvements for any calendar year cannot fall.[5] "Minimum" here means "the least quantity, amount." Random House Dictionary of the English Language (1980), p. 571. It does not mean "only," which means "solely,"

---

[4] Appellants argued they met their capital improvement obligations under the partnership agreement in a motion for summary judgment, in their trial brief, in their motion for directed verdict, and their motion for judgment n.o.v. The court denied the motions without opinion.

[5] The Partnership Agreement provides:

5. *Capital Improvements*. The General Partner, regardless of whether or not any Capital Improvement Funds have been set aside for the calendar year, will cause the limited partnership in each calendar year beginning on or after January 1, 1971, to install and construct minimum Capital Improvements in the Amusement Park in an amount equal to the lesser of 10% of the Proceeds for the immediately [preceding] calendar year (after deducting therefrom the amount of any sums loaned to the limited partnership during such immediately preceding calendar year) or $800,000; provided that, if Capital Improvements actually made during any calendar year exceed the minimum amount herein specified, the excess difference between such minimum amount and the amounts actually expended may be carried forward for two subsequent years as a credit against the obligation of the General Partner to make such minimum Capital Improvements.

or "exclusively." See *L & B Constr. Co. v. Ragan Enterprises*, 267 Ga. 809, 813 (482 SE2d 279) (1997). Consequently, this provision means that the general partner must make *at least* $800,000 in capital improvements in a calendar year and not *only* $800,000 per calendar year. The provision does not state that the general partner cannot or should not cause more to be invested. Further, the "carry forward" portion of the provision only lowers or eliminates the annual minimum capital improvements requirements for up to two years under certain conditions. It does not set what the general partner should invest in the park in any given year.

Salkin testified that this particular contract provision was added in the early 1970s because the general partner at the time was on the verge of bankruptcy and the partnership was concerned "that the park be maintained appropriately." The contract provision was intended to require the general partner to invest "separate and apart from the partnership" at least $800,000 of its own money in improvements. This provision "had nothing to do with whether the partnership, what [the] partnership would bill[,] but if the partnership didn't have enough money, the general partner would at least put in that [$800,000] as a loan so that the park could be maintained at that time."

Although the partnership agreement does not specify in dollars what the general partner should cause to be invested in the park each year, it gives the general partner exclusive control over the management of the park and the right to set aside and spend capital improvements funds from the gross revenues generated by the park as are necessary to advance the purposes of the partnership. The agreement provides that these purposes include repairing, maintaining, improving, and operating the park and conducting amusement activities for family entertainment. Nothing in the agreement evinces an intent to give the general partner absolute or uncontrolled discretion as to the amount to be spent on capital improvements or the type of capital improvements to be made. Rather, it may be fairly inferred from the agreement as a whole that the general partner was required to exercise discretionary judgment in these matters in good faith.

Where an agreement gives a party discretionary decision-making power, and such power is not left to the absolute or uncontrolled discretion of the party, the discretion is subject to an implied obligation that it be exercised in good faith. *MacDougald Constr. Co. v. State Hwy. Dept.*, 125 Ga. App. 591, 594 (188 SE2d 405) (1972); *Automatic Sprinkler Corp. &c. v. Anderson*, 243 Ga. 867, 868-869 (257 SE2d 283) (1979). Furthermore,

Laws in existence at the time a contract is executed are part

of that contract. Already in existence at the time the partnership in question here was created was the provision in OCGA § 23-2-58 that partners owe a duty to act in the "utmost good faith" with regard to each other.

(Citation and punctuation omitted.) *Wilensky v. Blalock*, 262 Ga. 95, 98 (3) (414 SE2d 1) (1992). Therefore it follows that the partnership agreement at issue here included, as a matter of law, that the general and limited partner had a fiduciary duty to act in utmost good faith toward each other. Id. Because the capital expenditures provision, construed in context, did not expressly give appellants the right to limit capital expenditures to *only* $800,000 per year, it did not relieve the general partner's duty to act in the utmost good faith. Id. See also *Southern Business Machines v. Northwest Financial Leasing*, 194 Ga. App. 253, 256 (2) (390 SE2d 402) (1990).

Moreover, the evidence shows that appellants never interpreted the capital expenditures provision to mean they had to invest only $800,000 per year. TWE executive Daly testified that appellants knew they had a duty to maximize the performance of the partnership parks. Although appellants presented evidence that they exceeded the $800,000 yearly minimum by spending $23.8 million in capital investments in the Georgia park during the seven-year tenure of the general partner, whether the amount and type of capital investments which were made satisfied the fiduciary duty to act in good faith was a question of fact for the jury under the circumstances of this case. *MacDougald Constr. Co. v. State Hwy. Dept.*, 125 Ga. App. at 594.

The partnership agreement required that the general partner perform its managerial responsibilities by determining in good faith the amount of yearly capital improvements to be made in excess of the $800,000 minimum, if any, and how the funds for capital improvements were to be spent. Evidence was presented that during its seven-year tenure the general partner either delayed or failed to make capital improvements in major thrill rides, which were the most important type of capital investment in terms of maintaining and improving the park's profitability and value. In conjunction with this evidence, additional evidence was presented from which the jury could conclude that the general partner exercised its discretion in these areas, not in good faith, but as part of a plan to underinvest in the park to suppress its value so that appellants could buy the park for a reduced price. Although the general partner presented evidence that it acted in good faith under the terms of the agreement, there was evidence to support a contrary conclusion that the general partner, in concert with the other appellants, acted in bad faith in violation of responsibilities under the agreement and fiduciary obligations

to the partnership by failing to make the amount or type of capital improvements which would have maintained and improved the profitability and value of the park.

Because the jury's verdict is consistent with this view of the evidence, we find no error.

2. (a) Appellants argue the trial court erred in charging the jury as follows:

> Should you find that one or more of the defendants breached any fiduciary duties to the plaintiffs, if you find that the defendants acted in good faith and in a manner that was consistent with the contractual obligations and its fiduciary duty under the general partnership law when taking such actions, you must find for the defendants.

Appellants contend the charge is contradictory. The charge is taken from appellants' Request to Charge No. 34. During the charge conference, the court, with assistance from defense counsel, edited the charge by deleting the paragraphs which came before and after the portion of the charge actually given. And, with the input of counsel, the court added certain phrases until the instant charge was crafted. After the entire charge was read to the jury, defense counsel excepted, objecting only to the court's addition of the phrase "and its fiduciary duty under the general partnership law" because that was "redundant and inconsistent and makes the charge confusing." However that phrase was, in substance, the very phrase appellants' counsel suggested adding. Error in the charge, if any, was self-induced and cannot be complained of on appeal. *Hancock v. Bryan County Bd. of Ed.*, 240 Ga. App. 622, 623 (2) (522 SE2d 661) (1999); *Levin v. State*, 222 Ga. App. 123, 125 (3) (473 SE2d 582) (1996). Moreover, "where an entirely different objection is argued in a brief, as here, than was asserted at trial, we will not consider it." *Beck v. State*, 235 Ga. App. 707, 709-710 (3) (510 SE2d 368) (1998). Finally, appellants never contended at trial, by objection or otherwise, that the charge was an incorrect statement of the law. The objection voiced was not sufficiently specific to apprise the court of error pursuant to OCGA § 5-5-24. Accordingly, any claim of error was waived. *Hancock v. Bryan County Bd. of Ed.*, 240 Ga. App. at 625-626 (7).

(b) Appellants also contend that a paragraph from the trial court's 13-page instruction on fiduciary duty contained an allegedly burden-shifting charge. However, appellants have not shown that a proper exception to the charge was made, and we find no such exception in our review of the record. Error, if any, was not preserved for our review. *Johnson v. Bruno's, Inc.*, 219 Ga. App. 164, 166 (4) (464 SE2d 259) (1995). Further, appellants have not argued, nor has our

review of the charge revealed, that a "substantial error" within the meaning of OCGA § 5-5-24 (c) was committed.

3. Appellants assert in four separate enumerations and throughout their brief that the trial court made numerous evidentiary errors that "hopelessly infected" the trial. To the extent appellants make a cumulative error argument, we reject it. See *Laney v. State*, 271 Ga. 194, 198 (11) (515 SE2d 610) (1999). The decision to admit or exclude evidence lies in the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. See *Dept. of Transp. v. Mendel*, 237 Ga. App. 900, 902 (2) (517 SE2d 365) (1999).

(a) (i) Appellants contend the trial court erred in granting appellees' motion in limine to exclude: (1) evidence that Flags was created as a tax shelter, and (2) evidence of the tax consequences to Fund and its investors if the general partner caused more than $800,000 per year to be spent on capital improvements. Appellants argue that this evidence was critical to its defense that the general partnership made only moderate capital improvements in order to generate "tax losses," which was, according to their interpretation of the partnership agreement, what Fund and its investors actually wanted. Appellants overstate the substance of the court's ruling.

The court, adopting the recommendation of the special master, agreed that certain defense themes were irrelevant and prejudicial. Specifically, the appellants were instructed not to inquire into Fund's *individual investors*' wealth, motives for investing, including any tax consequences to them, or on their return on investment. And, appellants were not permitted to inquire into Fund's return on investment, including any tax benefits, *prior to* the time appellants assumed responsibility for managing the park. Appellants were allowed to, and did, cross-examine Salkin on the tax consequences to Fund of capital investments in the park and presented their own expert testimony covering those points. We see no evidence that appellants were prohibited from making the argument they now advance. Rather, it appears appellants made a strategic decision to argue that the general partner invested much more in the Georgia park than it was obligated to under the partnership agreement because that defense theme was more consistent with the evidence actually adduced from appellants' own witnesses. For example, Pittman testified that he understood the partnership agreement required "some minimum amount" of annual capital investment, however, "every year we greatly exceeded that amount and we weren't even close to being near the minimum." Because appellants were able to present the evidence they contend was excluded, they have failed to show how they were harmed by the court's ruling. Consequently, appellants have not shown reversible error. See, e.g., *Cantrell v. Northeast Ga. Med. Center*, 235 Ga. App. 365, 371-372 (6) (508

SE2d 716) (1998) (harm as well as error must be proven).

(ii) The trial court properly excluded a document Fund's lawyers filed with the California Department of Corporations. That document, which contained statements about the return on Fund's investment in the Six Flags theme park and the success of the investment over its lifetime, was not indicative of appellants' performance as general partner and was of dubious relevance to the issues at trial. We see no abuse of discretion. See *Kicklighter v. Woodward*, 267 Ga. 157, 161 (4) (476 SE2d 248) (1996). Moreover, in light of the fact that appellants established how much Fund originally invested in the Georgia park, how much the park sold for in 1997, and how much Fund received in free cash flow both before and during appellants' tenure as general partner, we do not believe appellants were harmed by the exclusion of this document. See *Cantrell v. Northeast Ga. Med. Center*, 235 Ga. App. at 371-372 (6).

(iii) The trial court properly excluded "a calculation" pertaining to the value of the new partnership agreement made by Salkin's son, Kenneth. Because the younger Salkin, a college student, did not have the education, training, or experience necessary to give a theme park valuation, the trial court did not abuse its discretion in excluding his calculations. See OCGA § 24-9-67; *Martin v. Baldwin*, 215 Ga. 293, 297 (2) (c) (110 SE2d 344) (1959).

(iv) Appellants contend the trial court erred in excluding "an admission" by a Fund attorney that the Fund's new general partnership agreement with TWE was a "grand slam plus." The statement was not "excluded"; rather, the trial court denied appellants' motion to compel a document in which the statement was allegedly made on the ground that the document was privileged. Pretermitting whether the document was erroneously withheld, the transcript reveals that appellants, through TWE executive Ross, were able to show that the same Fund attorney admittedly believed "that the Fund had gotten a very, very rich deal." Because appellants have failed to show they were harmed by the exclusion of the complained-of statement, we find no error. *Cantrell v. Northeast Ga. Med. Center*, 235 Ga. App. at 371-372 (6).

(b) On November 17, 1998, the first day of trial, the judge entered an order which prohibited appellants from offering evidence tracing the flow of the $20 million Coca-Cola sponsorship fee as a sanction for discovery abuse. Appellants contend this was an unwarranted, or at least disproportionate, sanction. Appellants' arguments are not supported by the record.

On November 10, 1998, the trial court, adopting the special master's November 6, 1998 findings and recommendation with respect to this discovery dispute, found that appellants "willfully attempted to obstruct, in violation of court orders," appellees' efforts

to obtain the identities of and to take the depositions of witnesses who were knowledgeable about the flow of the Coca-Cola funds in connection with the recapitalization of SFTP and the closing of the stock purchase. The court found that appellants, instead of identifying or producing a witness for deposition, simply suggested that the person or persons sought were either employed with Chase Manhattan Bank or the firm of Lazard Freres; appellants stated they intended to "subpoena someone from Chase Manhattan Bank next week" and invited appellees to attend the deposition, once it was scheduled. Finding this effort at compliance inadequate, and in light of appellants' prior attempts "to obstruct discovery," the court ordered that the unnamed Chase Manhattan Bank witness would not be deposed until appellants specifically identified those persons most knowledgeable about the issues specified in appellees' OCGA § 9-11-30 (b) (1) notice. The court further ordered appellants to produce instanter those bank records which appellees had requested and identified by specific account number well over a year before, records which had been ruled discoverable and which should have been produced by February 28, 1998. Appellants were warned that failure to comply with the court's order would result in their being precluded from offering evidence on this issue.

On November 12, 1998, appellants wrote appellees and offered as a deponent a lawyer who had been involved in the SFTP stock purchase, but who had "no relevant documents in his possession." Moreover, this person was not available to be deposed until November 15, 1998, two days before trial. Most significantly, however, appellants failed to produce the requested bank records, arguing "[t]here are no documents at Time Warner. There are no documents apparently at Chemical or Chase. They have been destroyed either in the ordinary course of business or through other reasons." Appellees did not depose the offered witness since doing so without the requested documents would have been futile. After a hearing on appellees' motion for sanctions, the trial court found that appellants "willfully obstructed and failed to comply with the Court's Order of November 10, 1998" and, as the court had warned it would do, precluded appellants from offering evidence on the flow of the Coca-Cola sponsorship fee funds.

Trial courts have broad discretion to control discovery, including the imposition of sanctions. *Daniel v. Corporate Property Investors*, 234 Ga. App. 148 (505 SE2d 576) (1998). Absent a showing of a clear abuse of discretion, a court's exercise of that broad discretion will not be reversed. Id. Pretermitting whether appellants identified a deponent responsive to the OCGA § 9-11-30 (b) (1) request and therefore made a good faith effort to comply with that part of the court's order, it is clear to us that such a deposition, without reference to the

requested documents, would have been of little value. More importantly, though, it plainly does not satisfy the court's express order to produce the requested records. Appellants previously produced bank records, including a "boxful" of bank records on one account, and yet they could not locate these particular records and offered no credible reason for that failure. In fact, the judge could infer from the documents and arguments presented at the hearing that appellants did not undertake a timely or thorough search for the requested records they claimed were destroyed even though they had had over a year to do so. That conclusion was justified when, two weeks into trial, some of the requested records were inexplicably found and produced.

OCGA § 9-11-37 (b) (2) (B) specifically authorizes the court to prohibit a disobedient party from "introducing designated matters in evidence." Given the court's findings, which are supported by the evidence, we cannot say this sanction was unwarranted or disproportionate. See *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 308 (404 SE2d 607) (1991). We find no abuse of discretion. See *Tompkins v. McMickle*, 172 Ga. App. 62, 64 (2) (321 SE2d 797) (1984).

(c) Appellants argue the trial court erred in allowing appellees to present evidence of "unrelated claims" or "unrelated bad acts," for example, that appellants withheld financial projections or planned to build a competing theme park. Pretermitting whether this evidence can be labeled "unrelated" in a suit alleging an intentional breach of fiduciary duties and of the partnership agreement's implied duties of good faith and fair dealing, appellants did not object to any of this evidence when it was offered. Error, if any, was not preserved for our review. See *MARTA v. Green Intl.*, 235 Ga. App. 419, 425-426 (3) (b) (509 SE2d 674) (1998); see also *Frostgate Warehouses v. Cole*, 244 Ga. 782, 783 (262 SE2d 98) (1979).

Moreover, even if this evidence could be considered similar transaction evidence, it would be relevant to show appellants' motive, intent, or bent of mind. *Troncalli v. Jones*, 237 Ga. App. 10, 15-16 (4) (514 SE2d 478) (1999). Appellees requested that a limiting instruction on similar transaction evidence be given, but appellants successfully objected to it and did not request one of its own. Appellants may not now complain that the trial court granted its request. See *Bone v. State*, 178 Ga. App. 802, 806 (345 SE2d 46) (1986).

(d) Appellants argue the trial court erred in admitting improper testimony from Salkin. Appellants cite to 17 excerpts from Salkin's testimony, arguing that he was allowed to give evidence either that was outside his personal knowledge or which constituted a legal opinion. We have reviewed those excerpts which were accompanied by specific and timely objection and find that Salkin's answers were based upon his personal knowledge and that he gave no improper opinion testimony or testimony which invaded the province of the

jury. See OCGA § 24-9-65; *Ivy Inn v. MARTA,* 175 Ga. App. 580, 584 (4) (334 SE2d 319) (1985). Further, any error was rendered harmless by the trial court's instruction to the jury that the credibility of witnesses and the weight of the evidence were for their determination. See *Phelps v. Huff,* 214 Ga. App. 398, 403 (2) (b) (448 SE2d 64) (1994).

4. Appellants contend the trial court made statements in front of the jury which impermissibly impugned the credibility of defense witnesses. Of the eleven record citations referenced in appellants' brief, nine were the court's instructions to witnesses to answer counsel's questions with a "yes" or a "no" before giving an explanation. One statement was a reminder that the court must give permission before a witness is allowed to leave the witness stand. Appellants objected to none of these statements.

The only statement to which appellants interposed an objection was a statement made by the court that the jury "take notice of the fact" that testimony given by Pittman was "evasive." The court interrupted the cross-examination of Pittman at a point where Pittman responded to a question asking if a purchase by a company named Boston Ventures of 51 percent of what TWE owned in a Six Flags organization had triggered his receipt of a sum of money pursuant to a contract. Pittman responded that his receipt of the money was "technically" not triggered by the purchase made by Boston Ventures because, "It could have been anybody buying it would have triggered the contract," and therefore "It was not Boston Ventures that triggered it." The court interrupted at that point and began to question Pittman.

> THE COURT: Mr. Pittman, I usually just kind of sit over here and don't say much. The last colloquy that I heard went something like this, did Boston Ventures trigger your contract, you getting whatever you got, and you said technically, no, it could have been anybody; but it wasn't anybody. It was Boston Ventures, right?
> PITTMAN: That's correct.
> THE COURT: If it was Boston Ventures and if I know how to read and write, then who triggered your contract?
> PITTMAN: Boston Ventures.
> THE COURT: Amen. I'm going to give you another piece of advice. I want simple answers that an old Boy from Georgia can understand. I don't want anymore of this. Now, you know better than that. That, to me, is double-talk and you would not want me to be upset with you, trust me. Now, answer his question and I want you to answer it right the next time.

PITTMAN: Yes sir.

THE COURT: I'm going to ask the jury to take notice of the fact that this witness was evasive.

First, we conclude that the objected-to comment by the court was not an expression of opinion as to what facts had or had not been proved; therefore, no reversal is required under OCGA § 9-10-7. Rather, the court expressed its opinion that the witness was not responding to the question being asked and was being evasive. *Walker v. Bishop*, 169 Ga. App. 236, 242 (312 SE2d 349) (1983); *Simmons v. State*, 138 Ga. 137 (74 SE 1000) (1912). Moreover, we do not believe the court's statement commented on the credibility of the witness. Compare *Griffin v. State*, 142 Ga. App. 362, 363-364 (235 SE2d 724) (1977), vacated on other grounds, 240 Ga. 470 (241 SE2d 230) (1978); *Speagle v. Nationwide &c. Ins. Co.*, 138 Ga. App. 384, 385 (226 SE2d 459) (1976); *Carver v. Leach*, 53 Ga. App. 112, 115 (185 SE 155) (1936), in which we concluded that the courts' improper comments on the credibility of the witnesses in those cases required reversal. In *Griffin*, the court made statements which implied or expressed that the witness was lying. In *Speagle*, the court's statements that the witness was "equivocating" and "has changed her testimony once or twice" expressed an opinion that the witness was not being truthful. In *Carver*, the court not only stated that the witness was evading the questions but made additional statements implying that the witness knew the truth and was not telling it.

Although the foregoing cases, and particularly *Carver*, present a close question as to whether the court commented on Pittman's credibility, we conclude that the court's comment, taken in context, was not directed at Pittman's overall credibility as a witness, nor did it imply that Pittman was being untruthful. The court expressed its opinion that Pittman was being evasive by not responding directly to the particular question. See *Saladine v. State*, 169 Ga. App. 425 (313 SE2d 714) (1984). Accordingly, reversal is not required on the basis that the court expressed an opinion as to the credibility of the witness.

Although it was within the power of the court to exercise control over the witness to prevent unresponsive or evasive testimony, *Speagle v. Nationwide &c. Ins. Co.*, 138 Ga. App. 384, we nevertheless conclude that the objected-to statement made by the court to the jury was inappropriate and erroneous. See *Reed v. State*, 163 Ga. 206, 216 (135 SE 748) (1926). Under the circumstances, however, we find that the appellants have failed to demonstrate that the comment was harmful and requires reversal. Although Pittman was a key witness, the court's statement was limited in scope to a single response by Pittman on a minor point, and the statement did not disparage Pitt-

man's credibility in general. Moreover, the court's final charge thoroughly and properly instructed the jury on witness credibility and informed the jury that nothing the court "did or said during the course of this trial" was intended to "intimate, hint or suggest to you which of the parties should prevail in this case." Under these circumstances, the error was harmless. *Reid v. Harbin Lumber Co.*, 172 Ga. App. 615, 619 (2) (323 SE2d 845) (1984); see also *CSX Transp. v. Barnett*, 199 Ga. App. 611, 612 (1) (405 SE2d 506) (1991) (both harm and error must be shown to warrant reversal).

5. (a) Appellants argue the evidence on the issue of compensatory damages was insufficient to allow the jury to calculate the amount of compensatory damages to Fund[6] within a reasonable degree of certainty. As we have held:

> As to damages, a jury must be able to calculate the amount of damages from the data furnished and it cannot be placed in a position where an allowance of loss is based on guesswork. A jury must be able to calculate loss with a reasonable certainty. The party claiming damages carries not only the burden of proving the damages, but also furnishing the jury with sufficient data to estimate the damages with reasonable certainty. It is not necessary, however, that the party on whom the burden thus rests should submit exact figures. The rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages. Mere difficulty in fixing their exact amount, where proximately flowing from the alleged injury, does not constitute a legal obstacle in the way of their allowance, when the amount of the recovery comes within that authorized with reasonable certainty by the legal evidence submitted.

(Citations and punctuation omitted.) *CSX Transp. v. West*, 240 Ga. App. 209, 212-213 (4) (523 SE2d 63) (1999).

In this case, experts for both sides were able to establish the value of the new partnership agreement to Fund at between $286 million and $300 million. Using appellants' own internal documents, appellees also were able to show a plan to underinvest in and thereby depress the value of the Georgia park. The evidence adequately

---

[6] Although appellants state that a portion of the $48 million in damages awarded Flags was based on speculation, they fail to support that assertion, offering argument which is pertinent only to the award of damages to Fund. Consequently, we deem this enumeration of error, as it applies to Flags, abandoned. Court of Appeals Rule 27 (c) (2).

demonstrated that the Georgia park did not receive capital improvements or maintenance comparable to appellants' wholly owned parks. Moreover, appellants' documents revealed how much they typically invested in their wholly owned parks, following a "major/minor" plan for adding new attractions, thereby establishing a model for comparison. Using these documents and other information, appellees' expert on theme parks was able to calculate — using the multiple of EBITDA formula common to the industry — what an investor would have been warranted in investing in the Georgia park had it been managed and invested in the same manner as comparable parks during appellants' tenure as general partner. That warranted investment was estimated at between $442 million and $458 million. Based upon this information, appellees' accountant opined that, as a result of appellants' misconduct, Fund lost between $142 and $172 million on the new partnership deal. This evidence was sufficient to allow the jury to calculate damages to Fund caused by appellants with reasonable certainty. See *CSX Transp. v. West*, 240 Ga. App. at 212-213 (4); *Intl. Indem. Co. v. Regional Employer Svc.*, 239 Ga. App. 420, 422-423 (4) (520 SE2d 533) (1999).

(b) Appellants also argue the award of compensatory damages to Fund and Flags was excessive. As shown above, the $149 million award to Fund was well within the range of evidence; consequently, we will not disturb it. See *Crawford v. Presbyterian Home*, 216 Ga. App. 54, 56 (5) (453 SE2d 480) (1994); see also *Whitley v. Ditta*, 209 Ga. App. 553, 554-555 (2) (434 SE2d 108) (1993).

Appellees also presented evidence showing that Flags was charged $4.8 million in improper intercompany allocations, that it was overcharged by $1.4 million for the Viper roller coaster, and that it never received its $2.8 million share of the Coca-Cola sponsorship fee. Flags also lost between $12 million and $15 million in income attributable to the delay in installing Batman the Ride. And, appellees presented testimony that appellants used Flags' share of the Coca-Cola money to acquire an interest in SFTP, which was sold at a substantial profit. Appellees' accountant determined that Flags' share of that return on investment amounted to $26.3 million. Appellees' accountant opined Flags lost, as a result of appellants' misconduct, over $50 million. Because the $40.8 million awarded to Flags was within the range of evidence, we will not disturb it. See *Crawford v. Presbyterian Home*, 216 Ga. App. at 56 (5).

6. (a) Appellants argue punitive damages were not authorized by the evidence because appellees proved no aggravating or outrageous circumstances or fraud. Punitive damages, however, are awardable in tort actions in which the plaintiff proves by clear and convincing evidence that a defendant's actions demonstrated "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of

care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b).

Appellees presented evidence that TWE, SFTP, SFEC, and SFOG executives were aware of their fiduciary duty to appellees but consciously and intentionally disregarded that duty. As Pittman tellingly stated, TWE was "not interested in being in the business of managing assets for others." Rather, it was in the business of putting together business deals that would profit the company. And, to accomplish that, the appellants withheld vital business information from Fund and Flags, undertook to compete with them, took money belonging to them, and carried out a plan to depress the value of their investment, the Six Flags Over Georgia park. This evidence authorized the jury to find by clear and convincing evidence wilful misconduct that supported an award of punitive damages. We find no error. See *Elliott v. McDaniel*, 224 Ga. App. 848, 854 (5) (483 SE2d 104) (1996), rev'd on other grounds, 269 Ga. 262 (497 SE2d 786) (1998); *Daniell v. Clein*, 206 Ga. App. 377, 383 (3) (425 SE2d 344) (1992).

(b) Appellants argue that the trial court erred by failing to instruct the jury, "that the requisite separate finding that Defendants acted with 'specific intent to cause harm' [also] had to be proved by clear and convincing evidence." Appellants have cited no authority, and we have found none, requiring the court to give such a charge. The trial court properly charged the jury on the law pertinent to awarding punitive damages under OCGA § 51-12-5.1 (b), including the requisite "clear and convincing evidence" burden of proof, and whether appellants acted with specific intent to cause harm. We find no error.

(c) Finally, appellants argue the punitive damages award was excessive under Georgia law.

"Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." (Citation and punctuation omitted.) *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 164 (1) (e) (473 SE2d 256) (1996); OCGA § 51-12-5.1 (a). An award of punitive damages will not be disturbed on appeal unless it is "so excessive or inadequate as to shock the judicial conscience to the degree that a judgment entered thereon constitutes an error of law." (Citation and punctuation omitted.) *Wilson Welding Svc. v. Partee*, 234 Ga. App. 619, 620 (507 SE2d 168) (1998). The $257 million punitive damages award was roughly 1.3 times the $197 million in compensatory damages. Although we do not mechanically look to the ratio between general and punitive damages to resolve the question of excessiveness, that ratio is some evidence of whether the jury's award was infected by undue prejudice or bias. See *Southeastern*

*Security Ins. Co. v. Hotle*, 222 Ga. at 164 (1) (e). Given a 1.3-to-1 ratio, we cannot say that the award was excessive as a matter of law. See *Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. 613, 614 (1) (409 SE2d 501) (1991) (260-to-1 ratio upheld). We find no error.

*Judgment affirmed. Andrews, P. J., and Ruffin, J., concur.*

DECIDED JULY 13, 2000 —
RECONSIDERATION DENIED JULY 27, 2000 

*Chandler & Britt, Walter M. Britt, Alston & Bird, Ronald L. Reid*, for appellants.

*Butler, Wooten, Overby, Fryhofer, Daughtery & Sullivan, James E. Butler, Jr., George W. Fryhofer III, Cale H. Conley, Bondurant, Mixson & Elmore, H. Lamar Mixson, Michael B. Terry, Joshua F. Thorpe, Andersen, Davidson & Tate, Gerald Davidson, Jr.*, for appellees.