A07A0059. HENDRY et al. v. WELLS et al.
A07A0060. WELLS REAL ESTATE FUND I v. HENDRY et al.
(650 SE2d 338)

ADAMS, Judge.

The Class B limited partners in a real estate investment limited partnership allege that they were duped into investing because sales materials associated with the deal misrepresented what the Partnership Agreement said about how certain proceeds would be distributed between "Class A" and "Class B" partners. But the Class B partners did not attempt to rescind the transaction or sue in tort for fraud. Instead, they allege that for 13 or more years, the general partners breached their fiduciary duties to them by sending numerous communications that repeated the earlier misrepresentations in order to avoid potential claims by the Class B partners and the investing public, and thereby avoid potential liability. They also allege the general partners breached their fiduciary duty in three actions they took in response to their own observation that the Partnership Agreement distribution scheme might be "unfair and inequitable" to the Class B limited partners. The Class B partners brought this class action suit against the general partners and the property manager in five counts. The plaintiffs allege that the partnership is named as a necessary party only; they do not claim that they are entitled to any relief from the partnership itself.

Upon the defendants' motion for summary judgment on Counts 1 and 5 (breach of fiduciary duty for the 13 years of misrepresentations), the trial court held that the claims were barred by the applicable statute of limitation. Upon the defendants' motion to dismiss Counts 2, 3 and 4 (breaches of fiduciary duty after the defendants acknowledged a problem), the trial court held that the Class B partners had no standing to bring what, the trial court determined, were in fact derivative claims on behalf of the partnership, and therefore these counts were dismissed for failure to state a claim. The Class B partners appeal, and in a cross-appeal, the defendants appeal the denial of their motion for attorney fees.

Most of the facts are not in dispute. We therefore begin with the findings of fact in the trial court's opinion that detail the manner in which, in the mid-1980s, the plaintiffs became limited partners in Wells Real Estate Fund I, a limited partnership involved in commercial real estate development. As will be seen, the plaintiffs are "B" Unit holders, and the key issue in the case involves the manner in which "Net Sale Proceeds" are calculated for B Unit holders when property is sold.

Wells Real Estate Fund I ("the Partnership") is a Georgia limited partnership currently having Leo F. Wells, III ("Wells"), and Wells Capital, Inc. ("Wells Capital"), a Georgia corporation, as its general partners. The Partnership was formed on April 26, 1984 for the purpose of acquiring, developing, constructing, owning, operating, improving, leasing and otherwise managing, for investment purposes, income producing commercial or industrial properties. The Partnership Agreement has been amended on occasion over the years since its inception on July 30, 1984, but the section at issue in this litigation, Section 9.3, "Net Sale Proceeds", has not been amended.

During the period from September 6, 1984 through September 5, 1986 (the "Offering Period"), limited partnership units were offered for sale to qualified investors by financial planners and registered representatives of authorized securities broker/dealers by use of a Prospectus filed with the SEC which was deemed effective as of September 6, 1984. The Prospectus contained as exhibit B the "Restated and Amended Agreement of Limited Partnership of Wells Real Estate Fund I" ("Partnership Agreement") and as exhibit C the "Wells Real Estate Fund I Subscription Agreement & Signature Page" ("Subscription Agreement") to be signed by all investors. Each limited partner unit was sold for $250 or less. An investor could purchase either A units or B units or both. At the close of the Offering Period, 141,000 units (98,716 A units and 42,568 B units) were sold to a total of 4,895 investors for approximately $35,321,000 in proceeds to the Partnership.

The Partnership is structured such that A unit holders receive a preference in cash available for distribution, while B unit holders receive a preference in allocations of net tax losses and deductions. In the event of the sale of properties, the Net Sale Proceeds are to be distributed to each partner

in accordance with the positive balance in his or her Capital Account after allocation of Gain on Sale under Section 10.4. Specifically, Section 9.3 of the Partnership Agreement provides as follows:

> Except as otherwise provided for in a liquidation in Section 9.4 hereof and except for the reinvestment of Net Sale Proceeds as provided in Section 11.3(g) hereof, Net Sale Proceeds after the payment of all Partnership debts and liabilities and the establishment of any reserves which the General Partners, in their sole discretion, deem reasonably necessary, shall be distributed to each Partner in accordance with the positive balance in his Capital Account as of the date of distribution under this Section 9.3 (after allocation of the Gain on Sale as provided in Section 10.4 hereof).

The terms "Net Sale Proceeds" and "Capital Account" and "Gain on Sale" used in Section 9.3 are defined terms in the Partnership Agreement and in the Prospectus Glossary.

The Prospectus, including its Exhibit B (the Partnership Agreement), and its Exhibit C (the Subscription Agreement and Signature Page), was made available to Plaintiffs through their respective financial consultants prior to their purchase of B units during the Offering Period. Each Plaintiff executed a Subscription Agreement before purchasing units in the Partnership during the Offering Period on the following dates: James Hendry signed his Subscription Agreement on February 27, 1985; Robert and Karen Beneda signed their Subscription Agreement on September 25, 1984; William Mullin and his wife signed their Subscription Agreement on May 20, 1986.

By executing the Subscription Agreement, each Plaintiff agreed to be "bound by the terms and conditions of [the Partnership Agreement] as set forth as exhibit B to the Prospectus." In each Subscription Agreement Plaintiffs also agreed to the following:

> I agree that if this subscription is accepted, it will be held, together with the accompanying payment, on the terms described in the Prospectus and that, if admitted to the Partnership, *I shall be bound by the*

> *terms and conditions of the Restated and Amended Agreement of Limited Partnership (the "Agreement") of the Partnership as set forth as Exhibit B to the Prospectus.* In order to induce the General Partners to accept this subscription, I hereby represent and warrant to you as follows: I have *received the Prospectus and the Agreement.* . . .

> Each Plaintiff relied on advice and direction from their financial planners in making their decision to purchase and to hold B units. The record contains evidence from a hearing on August 3, 2004, in the prior Hendry action in which Plaintiffs admitted to consulting with their respective financial planners and having an opportunity to review and read the Prospectus, the Partnership Agreement and the Subscription Agreement before they made a decision to purchase B units in the Partnership.

(Emphasis in original.)[1]

In addition to the above facts, construed in favor of the plaintiffs, the "Sales Materials" associated with the investment (collectively, the prospectus along with the accompanying sales brochure and "bucket chart" used to sell Partnership units) show that the "Net Sale Proceeds" from the sale of Partnership properties would be distributed based on the limited partners' *original capital investment.* Thus, the Sales Materials did not accurately reflect what the Partnership Agreement itself provided — that Net Sale Proceeds "shall be distributed to each Partner in accordance with the positive balance in his Capital Account as of the date of distribution." The difference is critically important because the B unit holders' capital accounts were reduced over the life of the partnership by their allocation of tax losses. Indeed the prospectus explained that sale proceeds "may not always be pro rata among the Limited Partners due to the disproportionate allocations of tax items that will be given to the holders of the Class B units." By the time they filed their complaint, the B unit holders allege that they had essentially nothing in their Capital Accounts, and therefore they will not receive any Net Sale Proceeds in the event partnership property is sold. Nevertheless, the plaintiffs did not rescind, sue for fraud, or otherwise raise any claims either before they invested or in the several years after they invested in the limited partnership.

---

[1] The trial court's order was drafted by the defendants.

The plaintiffs assert they did not do so for two reasons. First, they contend the relevant provisions of the Partnership Agreement are difficult to understand. Second, for 13 or more years after the formation of the partnership (from 1987 through 2000), the defendant general partners sent several communications to the class B partners that misrepresented two material facts: (i) that they would distribute Net Sale Proceeds "pro rata," or on an "equal basis" based on the "original amount of money invested"; and (ii) that the Partnership Agreement included a "make-up provision" to ensure class B partners would ultimately receive the same amount as class A partners. Even the Partnership's annual SEC-filed 10-k report, which was sent to the plaintiffs, got it wrong, all the way through the year 2000. These representations were made despite the fact that the defendants changed §§ 9.3 and 10.4 in two subsequent and similar real estate investment partnerships — involving different investors — that were syndicated from 1986 through 1988.

Finally, in June 2000, as the partnership first approached an opportunity to sell one of the investment properties, the general partners sent out a "Consent Solicitation" related to the distribution of Net Sale Proceeds. In that communication, the general partners explained that as a part of their diligence in anticipation of the sale, they had reviewed the Partnership Agreement and had "determined that the method for distributing the net sale proceeds to the limited partners upon the sale of a property is unfair and inequitable to the limited partners holding Class B Units." The document then described a proposed amendment to the agreement designed to ensure that Class B Unit holders would ultimately receive Net Sale Proceeds equivalent to the Class A Unit holders. The general partners further explained that they "have always intended to distribute the net sale proceeds in an equitable manner." The document stated that approval of a majority of the limited partners was required.

But in an amended Consent Solicitation distributed on August 25, 2000, the general partners acknowledged that the Partnership Agreement required the consent of every Class A Unit holder. To encourage a sufficient vote, the general partners explained, among other things, that under the distribution plan set forth in the Partnership Agreement, "the Class A Limited Partners would receive an unintended windfall at the expense of the Class B Limited Partners. . . ." And, they added:

> We strongly believe that the Class B Limited Partners did not appreciate the ramifications of the technical provisions of Section 9.3 of the Partnership Agreement at the time they invested, especially in light of the contrary information contained in the Wells Fund I Bucket Chart and subsequent

information we have distributed to the limited partners throughout the term of the Partnership.

Finally, the partnership agreed to cease efforts to market partnership property until the problem was fixed.

By January 2002, however, the partnership announced that it was abandoning the effort to amend the Partnership Agreement because it could not get the votes, and it announced that Net Sale Proceeds would be determined according to the original Partnership Agreement. The plaintiffs filed suit on March 12, 2004, voluntarily dismissed the action on June 3, 2004, and refiled most of the claims on November 24, 2004 in the present action.

### Case No. A07A0059

1. In Counts 1 and 5, the plaintiffs allege that the general partners breached fiduciary duties owed to the Unit B holders by sending numerous communications to them, after the partnership had been formed, that either knowingly (Count 1) or negligently (Count 5) misrepresented the Partnership Agreement's distribution structure. They allege the general partners failed to take lawful and prudent actions to correct or mitigate the problem and that their communications were an attempt to cover up the earlier mistake. The plaintiffs allege that they were damaged by every day that passed during these communications because, without the truth, they were foreclosed from taking other actions to protect their rights or preserve their investment. They allege that "each day of delay reduced the amount of Net Sale Proceeds that, without litigation, the plaintiffs ... would realize upon Partnership properties' sales." They also assert that the general partners' communications prevented them from discovering the truth until June 2000. The trial court held that these claims were barred by the four-year limitation found in OCGA § 9-3-31 (personal property). We agree.

Where a fiduciary fails to disclose a material fact there is actionable fraud. OCGA § 23-2-53; *Goldston v. Bank of America Corp.*, 259 Ga. App. 690, 696 (577 SE2d 864) (2003); *Paul v. Destito*, 250 Ga. App. 631, 635 (1), n. 5 (550 SE2d 739) (2001). Construed in favor of the plaintiffs, the facts show that the defendants breached their fiduciary duty by making material misrepresentations and omissions about the Net Sale Proceeds in their communications with the plaintiffs for 13 years. The statute of limitation for a cause of action for breach of fiduciary duty is triggered by a wrongful act accompanied by any appreciable damage. See *Allen v. Columbus Bank & Trust Co.*, 244 Ga. App. 271, 272 (1) (534 SE2d 917) (2000). As is clearly stated in the complaint, the plaintiffs allege that their

damages began at the time of the first communication in 1987.[2] Over four years passed from 1987 before the plaintiffs filed suit. Therefore, the claims of breach of fiduciary duty found in Counts 1 and 5 were filed outside of the limitation period.

The plaintiffs argue that the limitation period was tolled by the defendants' continued fraud through the year 2000.[3] We disagree. "Under Georgia law, fraud that gives rise to a cause of action does not necessarily establish the fraud necessary to toll the statute of limitation." *Allen*, 244 Ga. App. at 274. In *Allen*, this Court held that even if a letter from a fiduciary contained fraudulent statements sufficient to toll the limitation period for a claim against the fiduciary, the statute of limitation would not be tolled where the plaintiff had information in her possession from which she could have discovered the truth. Id. The same rule applies here because the plaintiffs have been on notice of the true contents of the Partnership Agreement the entire time.

The fiduciary duty between the parties arose at the time that the limited partners entered into the partnership, not before. *Hancock v. Gunter*, 195 Ga. 646, 650 (4) (24 SE2d 772) (1943). Prior to that time, the limited partners had a duty to read the Partnership Agreement before signing it. See generally *A. J. Concrete Pumping v. Richard O'Brien Equip. Sales*, 256 Ga. 795, 796 (1) (353 SE2d 496) (1987). There is simply no question that, prior to signing the Partnership Agreement, the plaintiffs had an opportunity to read and understand it, a duty to do so, and the benefit of their own financial advisors. Furthermore, after signing it, they never sought to rescind or sue for fraud, and ever since then they have received benefits in the form of allocation of tax losses. Accordingly, the plaintiffs were on notice of and bound by the terms of the Partnership Agreement from the day of the investment — and certainly at the time they received the first communication from the general partners containing conflicting information, which occurred in 1987. Cf. *Newitt v. First Union Nat. Bank*, 270 Ga. App. 538, 544 (2) (607 SE2d 188) (2004) (party precluded from asserting fraud claim because he was bound by terms of investment agreement that provided that he willingly assumed the risk of the investment). Like in *Allen*, 244 Ga. App. 271, even if the series of communications from the defendants contained fraudulent statements normally sufficient to toll the limitation period, the

---

[2] The continuing tort theory is not applicable, so the plaintiffs claims accrued in 1987. *Corp. of Mercer Univ. v. Nat. Gypsum Co.*, 258 Ga. 365, 366 (2) (368 SE2d 732) (1988) (continuing tort theory only applicable to cases involving personal injury).

[3] See OCGA § 9-3-96 ("If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud.").

limited partners have always had proper notice of the information necessary to determine the truth. Accordingly, the statute of limitation was not tolled in this case.[4]

The plaintiffs' arguments that their claim was not ripe until the first piece of partnership property was sold or that they may have experienced no damages if the partnership had been dissolved before any property sales is belied by their own complaint, which alleges that they were damaged in multiple ways every day following the misleading communications that began in 1987. The statute of limitation may begin to run even though the plaintiff has not sustained all or even most of his damages. *Fuller v. Dreischarf*, 238 Ga. App. 18, 19 (1) (a) (517 SE2d 89) (1999).

The plaintiffs also contend the Partnership Agreement was so complicated that it was too difficult for them to recognize that the general partners were misleading them about its contents until the general partners confessed to a problem in the year 2000. They cite *Jim Anderson & Co. v. Partraining Corp.*, 216 Ga. App. 344 (454 SE2d 210) (1995) (insured relieved of duty to examine policy in minute detail when expert insurance agent had been hired to procure certain coverage). But that case is inapposite because it involves liability of an expert insurance agent for failing to procure requested insurance coverage. It does not stand for the general proposition that one party to a contract is relieved of examining it in detail just because it is complicated. We know of no other applicable exception to the duty-to-read requirement.

2. The plaintiffs also contend the trial court erred by dismissing their three remaining claims on the ground that they were derivative in nature and that, therefore, the plaintiffs did not have standing to bring them. We agree in part.

On appeal, we conduct a de novo review of a trial court's ruling on a motion to dismiss. *Penny v. McBride*, 282 Ga. App. 590 (639 SE2d 561) (2006). Our role is "to determine whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, and with all doubts resolved in the plaintiff's favor, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts." Id. Nevertheless, "a party to an action is bound by material allegations made in his pleadings so long as they

---

[4] *Douglas v. Bigley*, 278 Ga. App. 117 (628 SE2d 199) (2006), is distinguishable for two reasons. First, although it involves breach of fiduciary duty, it does not address the fraud necessary to toll the statute of limitation for such a claim. Second, in *Douglas*, the fiduciary gave reckless legal advice during the fiduciary relationship about the legality of an investment scheme involving the plaintiff, and there was no indication that the plaintiff had knowledge to the contrary. In this case, as explained herein, the plaintiffs had affirmatively agreed to the contents of the Partnership Agreement at the time they invested.

remain in his pleadings, and the plaintiff's contradictory pleadings, if any, are to be construed in favor of the defendant." (Citations and punctuation omitted.) *Kessler v. Ga. Intl. Life Ins. Co.*, 165 Ga. App. 60, 61 (3) (299 SE2d 131) (1983). See also OCGA § 24-3-30; *Ballenger Paving Co. v. Gaines*, 231 Ga. App. 565, 570 (1) (b) (499 SE2d 722) (1998).

(a) The parties and the trial court have concluded without direct authority that a limited partner's ability to bring a direct claim against the partnership is governed by the "special injury" rule applicable to corporations and their shareholders.[5] The trial court simply found that the plaintiffs' claims were derivative in nature — based on the special injury rule — and that therefore they could not be brought under the Uniform Limited Partnership Act (OCGA § 14-9A-1 et seq.) ("ULPA"), which has no express provision for derivative actions. We must first determine the proper test for plaintiffs' claims.

The partnership was formed pursuant to the ULPA, which preceded Georgia's current act — the Georgia Revised Uniform Limited Partnership Act (OCGA § 14-9-100 et seq.) ("RULPA").[6] And the parties agree the ULPA governs this issue.[7] The ULPA includes a provision that addresses a limited partner's right to institute proceedings against the partnership. See OCGA § 14-9A-80. That section provides that a limited partner "is not a proper party to proceedings by or against a partnership, except where the object is to enforce *a limited partner's right* against, or liability to, the partnership." (Emphasis supplied.) OCGA § 14-9A-80. This is the basis of authority for addressing whether the plaintiffs were allowed to assert their

---

[5] In 1994, our Supreme Court adopted Delaware law holding that a shareholder can maintain a direct action against a corporation if he alleges a "special injury." *Grace Bros., Ltd. v. Farley Indus.*, 264 Ga. 817, 819 (2) (450 SE2d 814) (1994). In 2004, however, the Supreme Court of Delaware discarded that rule in favor of one that turns "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" (Emphasis in original.) *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A2d 1031, 1033 (Del. 2004). The Supreme Court of Georgia has yet to adopt or comment on *Tooley*. See generally Art. VI, Sec. VI, Par. VI, Ga. Const. of 1983; *Seymour v. State*, 262 Ga. App. 823, 824 (1) (586 SE2d 713) (2003) (this Court is bound by the rulings of the Supreme Court).

[6] The RULPA includes a provision that allows limited partners to bring derivative suits against the partnership or general partners when the general partners refuse, or could reasonably be expected to refuse, to bring an action on behalf of the partnership. OCGA § 14-9-1001.

[7] See *Prodigy Centers/Atlanta No. 1 v. T-C Assoc.*, 269 Ga. 522, 525, n. 4 (501 SE2d 209) (1998) (regarding how earlier statute is still applicable where new statute has not been adopted by the partnership).

claims against the partnership.[8] There is no case law in Georgia interpreting this clause of the ULPA.

The ULPA has its own rules of construction: First, the normal rule that statutes in derogation of common law are to be strictly construed is not applicable. OCGA § 14-9A-3 (a). Second, the ULPA "shall be so interpreted and construed as to effect its general purpose to make uniform the law of those states which enact it." OCGA § 14-9A-3 (b). Finally, "in any case not provided for in [the ULPA], the rules of law and equity . . . shall govern." OCGA § 14-9A-4.

A limited partner's rights under the ULPA are enumerated in OCGA § 14-9A-42 et seq. They include access to the partnership books, the ability to demand true and full information and a formal account of the partnership, dissolution and winding up by court decree, a share of the profits or compensation as provided by the partnership certificate, and the return of his contribution as provided by OCGA §§ 14-9A-46 and 14-9A-47. See OCGA § 14-9A-42. It has been held that a limited partner "has a contractual or statutory right to a portion of the financial items produced by the limited partnership." *Prodigy Centers/Atlanta No. 1 v. T-C Assoc.*, 269 Ga. 522, 526 (3) (501 SE2d 209) (1998). Additional rights are set forth in any agreement between the partners, which governs their behavior so long as it does not violate other law. *Westminster Properties v. Atlanta Assoc.*, 250 Ga. 841, 842 (1) (301 SE2d 636) (1983).

In addition to a limited partner's enumerated and contractual rights, in Georgia, partners owe fiduciary duties directly to one another, including a duty to act in the "utmost good faith," OCGA § 23-2-58, and with "the finest loyalty." *Clement A. Evans & Co. v. Waggoner*, 197 Ga. 857, 865 (30 SE2d 915) (1944). Accordingly, general partners also owe fiduciary duties to the limited partners, which the limited partners are entitled to assert.[9] The defendants do

---

[8] We need not address the separate question of whether derivative suits are allowed under the ULPA because the plaintiffs did not plead any derivative claims nor argue that they are entitled to one. See generally 26 ALR4th 264 "Right Of Limited Partner To Maintain Derivative Action On Behalf Of Partnership" (noting that a number of courts – but not all – have held that, under the ULPA, a limited partner has a right to maintain a derivative action on behalf of the entity). See also *Klebanow v. New York Produce Exchange*, 344 F2d 294 (2d Cir. 1965).

[9] See also *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 245 Ga. App. 334, 346 (537 SE2d 397) (2000), vacated in part, *Cooper Indus. v. Leatherman Tool Group*, 532 U. S. 424 (121 SC 1678, 149 LE2d 674) (2001), reinstated with the exception of Division (6) (c), *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 599 (563 SE2d 178) (2002) (OCGA § 23-2-58 – which provides that partners owe a duty to act in the "utmost good faith" with regard to each other – was included as a matter of law in limited partnership agreement, thereby establishing that general and limited partner had fiduciary duty to act in utmost good faith toward each other).

not contest that they had such a duty. It follows that a limited partner may bring claims against the partnership that arise out of any of the above rights.

In addition, because there are no cases in Georgia addressing what rights a limited partner may assert in a claim against the partnership, we will also look to the law of other jurisdictions considering the same question under the ULPA, so as "to effect its general purpose to make uniform the law of those states which enact it." OCGA § 14-9A-3 (b). Two cases from federal court provide a review of case law from several states as well as a framework for addressing the question before us. See *Kenworthy v. Hargrove*, 855 FSupp. 101 (E.D. Pa. 1994); *Lenz v. Associated Inns and Restaurants Co. of America*, 833 FSupp. 362 (S.D. N.Y. 1993), and cases cited therein.

The court in *Kenworthy* addressed the standing of limited partners to bring direct claims under the same provision of the ULPA regarding enforcing "a limited partner's right against or liability to the partnership." *Kenworthy*, 855 FSupp. at 104-105. The ten limited partners of a private bank sought redress of alleged individual losses suffered by each of them when the Pennsylvania Secretary of Banking seized the bank and transferred certain assets and liabilities to another bank. Id. at 103, 105. The court examined New York law and held that a limited partner may bring a claim when the primary injury alleged in the complaint is to the individual plaintiffs rather than the partnership. Id. at 106. Furthermore, indirect damage to a partner's contribution resulting from an injury to the partnership as a whole may not be brought as a direct claim:

> When a limited partner alleges wrongs to the limited partnership that indirectly damaged a limited partner by rendering his contribution or interest in the limited partnership valueless, the limited partner is required to bring his claim derivatively on behalf of the partnership.

Id.

In another case under the ULPA, the court in *Lenz*,[10] after examining New York and Oklahoma law, concluded that "[t]hree kinds of legal claims may be appropriate when a limited partner seeks to redress breach of fiduciary duties and other wrongdoing by the general partners of the partnership." *Lenz*, 833 FSupp. at 378. These are (1) individual, direct claims against the general partners,

---

[10] Although the court in *Lenz* was addressing a question of diversity jurisdiction, its analysis of a limited partner's potential claims is helpful here.

(2) "direct claims against the general partners by means of a representative action in the form of a class action lawsuit on behalf of all the limited partners," and (3) derivative claims. Id. Quoting a Delaware court, the court in *Lenz* added, " 'The distinction between derivative and individual actions rests upon the party being directly injured by the alleged wrongdoing.' [Cit.]" Id. at 380. Or, in other words, the question turns on "the nature of the injury alleged and the entity which sustains the harm." Id.[11] Following these parameters, *Lenz* held that an injury that causes reduced income to the limited partnership as a result of a general partner's misconduct, that in turn causes a reduction in the distribution of profits, is an injury to the partnership and not the limited partners. Id.

(b) In Count 2 in the present action, the plaintiffs alleged that the general partners blocked the favorable settlement of an earlier related lawsuit brought to address the issue of how Net Sale Proceeds were meant to be paid. The proposed settlement was a compromise between the Class A and Class B partners regarding how the anticipated Net Sale Proceeds would be divided when they were eventually paid. The proposed settlement, if fully consummated, allegedly would have caused the Class B limited partners to be paid $5 million from money that otherwise would have been paid to the Class A limited partners under the terms of the Partnership Agreement. But despite the fact that the general partners claimed to be a disinterested stakeholder to the Net Sale Proceeds, they refused to sign the settlement agreement. Setting aside the conditional nature of this claim and focusing on whether limited partners can bring such a claim, we conclude that they can.

The alleged injury was related to a "right to a portion of the financial items produced by the limited partnership." See *Prodigy Centers*, 269 Ga. at 526. And the injury fell on the plaintiff Class B partners and not the partnership itself. In this claim the plaintiffs did not allege that the general partner caused the partnership to lose $5 million. Rather, the $5 million is money that would have been paid to the Class A shareholders anyway as a matter of course, as a part of their distribution of Net Sale Proceeds. In other words, it should make no difference to the partnership who gets the Net Sale Proceeds, and a change in the allocation should cause the partnership no injury.

The trial court focused on one sentence out of eighteen paragraphs pertaining to this count in which the plaintiffs alleged that by

---

[11] Under corporate law, a shareholder may bring a direct action if he or she alleges either of two types of "special injury": (1) "an injury which is separate and distinct from that suffered by other shareholders," or (2) "a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation." *Grace Bros.*, 264 Ga. at 819 (2).

their actions, the general partners, "harmed all Limited Partners and the Partnership and prevented the Limited Partners from enjoying the benefits of the [settlement]." But we find that the sentence was taken out of context and that by doing so the trial court failed to construe the plaintiffs' allegations in their favor as is required when addressing a motion to dismiss. See *Houston v. Houston*, 267 Ga. App. 450 (600 SE2d 395) (2004).

(c) In Count 3, the plaintiffs allege that they were fraudulently induced into voting their shares in favor of the April 2002 "Consent Solicitation" issued by the defendants because the defendants allegedly made materially misleading statements in the solicitation materials. In the Consent Solicitation, the general partners sought investor approval to amend the Partnership Agreement so as to permit them to reinvest Net Sale Proceeds generated from the sale of some of the Partnership's properties into another Partnership property, allegedly as a part of the general partners' scheme to delay as long as possible exposing the issue of how Net Sale Proceeds were to be calculated. Here, the plaintiffs contend that a personal right — the right to vote their shares — was violated because the solicitation materials were materially misleading. They sought a declaration that the April 2002 Solicitation is null and void, which would thereby revoke the general partners' authority to reinvest certain proceeds without making a distribution. The trial court found that the relief sought — a declaration that the adoption of the April 2002 Consent Solicitation was null and void — would inure to the benefit of all limited partners, not just the Class B partners, and to the entire partnership.

This claim appears to be one arising out of the rights of the limited partners. We can assume that the limited partners had a right to vote in this situation given that the general partners submitted the decision to them. With regard to the injury, if the vote had failed, then Net Sale Proceeds would have been available for distribution to the limited partners in accordance with the Partnership Agreement. Accordingly, this claim involves a right of the limited partners and an injury to their right to receive compensation, not an injury to the partnership itself. We therefore reverse the trial court's decision on this count.

(d) In Count 4, the plaintiffs allege that the defendants breached a contract with Class A and Class B partners, based on the June 5, 2000 Consent Solicitation. The Consent Solicitation stated that in the event a majority of the limited partners voted in favor of an amendment to the Partnership Agreement designed to remedy the problem with the calculation of Net Sale Proceeds, defendant Wells Management Company, Inc., an affiliate of the general partners controlled by Leo Wells, "has agreed to forgive all property management fees owed

by the partnership. . . ." The General Partners later admitted that they had received the appropriate number of votes. But they refused to proceed with the arrangement because they were prohibited by another provision of the Partnership Agreement that required unanimous consent of the Class A partners. (In other words, the plaintiffs have alleged a breach of fiduciary duty based on the general partners' failure to breach a provision of the Partnership Agreement requiring unanimous consent of the Class A limited partners.) Despite this flaw in the June 5, 2000 offer, the plaintiffs allege that a contract was formed when a majority of limited partners consented and that they are entitled to bring a claim of breach of contract against the defendants.

The plaintiffs may not bring this claim directly. The claim involves a contractual relationship between the limited partnership and a third party. If this claim had any merit, it would inure to the benefit of the entire partnership by reducing its liability to a third party.

Accordingly, we reverse the trial court's holding with regard to Counts 2 and 3.

### Case No. A07A0060

In the cross-appeal, the defendants contend the trial court erred by denying their claim for attorney fees under OCGA § 9-15-14. Because we are reversing the dismissal of Counts 2 and 3 of the plaintiffs' complaint, we find no basis for reversing the trial court's decision on those counts nor on Count 4. We also cannot say the trial court's decision not to award attorney fees regarding Counts 1 and 5 was an abuse of discretion given the nature of the allegations and the general partners' actions.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Ellington, J., concur.*

DECIDED JULY 10, 2007 —
RECONSIDERATION DENIED JULY 26, 2007 —

*Vincent T. Gresham, Christopher J. McFadden,* for appellants.
*Anderson, Tate & Carr, Thomas T. Tate, Troutman Sanders, James K. Quillian, Merle R. Arnold III, William M. Droze,* for appellees.