T.C. Memo. 2012-73

UNITED STATES TAX COURT

ESTATE OF BEATRICE KELLY, DECEASED, BETTY K. WYATT, WILLIAM
T. KELLY, CLAUDIA K. CANTRELL, EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24783-08.                    Filed March 19, 2012.

        D transferred assets to four limited partnerships and retained
over $1,100,000 in her own name.  D gave limited partnership interests
in three of the four partnerships to her children and their heirs.  A
corporate general partner managed and paid the expenses of the limited
partnerships, for which the general partner received a management fee.

        R determined that, pursuant to I.R.C. sec. 2036(a), D retained an
interest in the transferred assets, the transfers were not bona fide sales
for adequate consideration, and the value of the transferred assets is
includable in D's gross estate.

Held: D's transfer of assets to the limited partnerships was a bona fide sale for full and adequate consideration, and thus the value of the transferred assets is not includable in D's gross estate pursuant to I.R.C. sec. 2036(a).

Held, further, the management fee paid to the general partner was not a retention of income by D, and thus the value of the gifted partnership interests is not includable in D's gross estate.


Vivian D. Hoard, for petitioner.

John T. Arthur, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


FOLEY, Judge: The issue for decision is whether the value of assets is includable in decedent's gross estate pursuant to section 2036(a).[1]

FINDINGS OF FACT

In 1946 Beatrice Kelly (decedent) and her husband opened a quarry in Rabun Gap, Georgia. Decedent and her husband had four children: William "Bill" Kelly, Betty Wyatt, Claudia Cantrell, and Roy Kelly. Bill, Betty, and Claudia (collectively, the children) each worked in the family business throughout their life.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Roy had Down syndrome, could not care for himself, and lived with decedent. Decedent's husband ran the family business and decedent had little, if any, business and investment experience. On January 25, 1990, decedent's husband died and decedent inherited his estate which consisted of two quarries, real property, promissory notes, and stock (i.e., 1,000 shares of Vulcan Materials Co., 950 shares of Liberty Bancorp of Georgia, Inc., and 200 shares of Northeast Georgia Development Corp.).

On March 29, 1991, decedent executed her last will and testament (decedent's will), which included specific bequests of real estate, stocks and bonds, and personal items. The residuary clause provided that the remainder of her estate be distributed equally among her children.

After her husband's death, the children helped decedent manage the family business. Betty managed the books until Claudia could move closer to decedent and take over the day-to-day operations of the business. Bill inspected and maintained the quarries and rental properties. The children also helped decedent manage her financial investments and acquire significantly more stock.

Decedent's health began to decline and she became increasingly neglectful, often forgetting whether she had performed routine matters and taken care of Roy's basic needs. In 1998 a doctor diagnosed her with Alzheimer's disease, and as her

illness and forgetfulness progressed, she became abusive, leading Bill, pursuant to an agreement by the children, to apply for appointment as and become, Roy's guardian.

On October 21, 2001, without knowing the contents of decedent's will, the children signed a settlement agreement pursuant to which decedent's estate would be distributed equally among themselves. On November 15, 2001, the children filed a petition for the appointment of guardian for decedent with the Rabun County Probate Court (probate court). A doctor evaluated decedent and reported the findings to the probate court. On December 18, 2001, the probate court found decedent to be an incapacitated adult by reason of mental disability. On January 29, 2002, the probate court issued a final order appointing the children as decedent's coguardians. By March 2002 decedent was admitted to an Alzheimer's unit in a nursing home and in July of that year, Roy died.

In the summer of 2002 the children received decedent's will and discovered that, primarily because of uneven asset appreciation and acquisition, decedent's will did not divide her estate equally among the children. For example, decedent's will bequeathed all stock to Bill and Claudia equally, with none going to Betty. Between the signing of decedent's will in 1991 and 2002, decedent converted nonstock assets into over $1,500,000 in stock. To address this matter, on August 8, 2002, the

children signed a second settlement agreement in which they agreed to honor all specific bequests to nonsignatories of the agreement and to distribute the remainder among the children in equal shares.

After moving decedent to the nursing home, the children agreed that Betty would purchase decedent's house. In order to sell decedent's house, the children, as coguardians, were required to petition the probate court and obtain the approval of decedent's guardian ad litem. Furthermore, the children were required to obtain the probate court's approval with respect to all matters relating to the routine maintenance and upkeep of decedent's property, including stock transactions, real property improvements, and the purchase and sale of assets. In 2002 decedent's property consisted of bank accounts, common stock, bonds, and real estate. The stocks consisted of 3,000 publicly traded shares of Vulcan Materials Co., 32,578.379 publicly traded shares of Regions Financial Corp., 9,250 privately held shares of the Gordon Bank, and 9,250 privately held shares of Liberty Bancorp of Georgia, Inc. The real estate consisted of 27 parcels which included two rock quarries, a subdivision with rental homes therein, a post office, and a rural property with a large waterfall and picnic facilities (waterfall property).

Decedent's concerns about her potential liability were heightened when a dump truck going to decedent's quarry was involved in a collision resulting in

significant injuries. The dump truck driver's insurance company unsuccessfully attempted to hold decedent liable. Because of the public traffic through the post office, subdivision, and waterfall properties, decedent also had potential liability exposure with respect to those properties. The discovery of bullets in a campfire at the waterfall property reinforced decedent's concerns.

The children wanted to ensure the settlement agreements were legally enforceable and took the settlement agreements to Albert English, an attorney who had assisted them with the guardianship proceedings. Mr. English informed the children that they could effectuate the settlement agreements after decedent's death by executing disclaimers but recommended that they discuss the matter with Woodrow Stewart, an estate planning attorney. Mr. Stewart pointed out that, if one of the children predeceased decedent, the child's heirs' refusal to sign disclaimers could result in an unpredictable distribution of the estate's assets. Because the children believed that their heirs would not disclaim, they hired Mr. Stewart to assist them in equalizing decedent's estate. Mr. Stewart discussed with the children the nature of decedent's assets, the difficulties of managing decedent's assets as guardians, and the desire that each of the children share equally in decedent's estate. The children further informed Mr. Stewart about dangerous incidents and special circumstances on decedent's property (i.e., public access, dynamite

blasting, rock throwing, and bullets discovered at a campsite). At the time she hired Mr. Stewart, decedent and the children had not considered tax consequences.

Mr. Stewart prepared a plan that called for the creation of four limited partnerships and a corporation which would serve as general partner of the limited partnerships (collectively, the plan). Decedent would create three limited partnerships (i.e., one for the benefit of each of the children), transfer equally valued assets to each of these partnerships, transfer the quarries to a fourth partnership, and retain, in her own name, over $1,100,000 in liquid assets, including certificates of deposit and investment accounts. The real property listed as specific bequests to the children in decedent's will would be contributed to the partnerships. By contributing property that would otherwise be the subject of unequal specific bequests to the partnerships, the specific bequests would be converted to equal devises of partnership interests, passing pursuant to the residuary clause in decedent's will.

The children, as coguardians, on May 5, 2003, petitioned the Superior Court of Rabun County, State of Georgia, (superior court) for approval of the plan (superior court petition). See Ga. Code Ann. sec. 29-5-5.1 (2007). The superior court petition provided in part:

The Will of Mrs. Kelly does not divide the estate equally among the children. The children of Mrs. Kelly have entered into a written agreement whereby the children have agreed to divide the estate equally among themselves after the death of Mrs. Kelly. * * * Under the estate plan proposed herein, equalizing the allocation of inherited assets can be achieved in a simple way without the necessity of a complex series of disclaimers and would reduce the risk of potential conflict and disagreement among the heirs.

*       *       *       *       *       *       *

Pursuant to an executed partnership agreement of each of the limited partnerships, the general partner is entitled to a special allocation of the net income of the limited partnerships each year in order to pay the operating expenses of the limited partnerships and a reasonable management charge for the general partner's management duties and responsibilities. Because the ward will own all the outstanding stock in the corporation that will serve as the general partner, the special allocation of net income for the reasonable management charge will insure that the ward will be provided with adequate income to cover the ward's probable expenses for support, care and maintenance for the remainder of the ward's lifetime in the standard of living to which the ward has become accustomed. Specifically, the corporation that will serve as the general partner will receive from each limited partnership a percentage of the net asset value of each limited partnership as determined on December 31 of each year. * * *

The superior court petition included a statement that the proposed plan would result in estate tax savings of $2,985,177.

On June 3, 2003, the superior court held a hearing and entered an order approving the plan. A guardian ad litem represented decedent at the hearing. The superior court found: decedent was incompetent; decedent's incompetency was

expected to continue for her lifetime; implementation of the plan allowed for continued support of decedent during her lifetime; a competent, reasonable person in decedent's circumstances would likely implement the plan to avoid undesirable tax consequences; and there was no evidence that decedent, if able, would not make the transfers set forth in the plan.

On June 17, 2003, as the first step in implementing the plan, decedent[2] incorporated KWC Management, Inc. (KWC). The children were elected officers and directors of KWC and decedent owned all KWC shares.

On June 30, 2003, decedent executed partnership agreements relating to Betty K., LP, created for the benefit of Betty and her family; WTK, LP, created for the benefit of Bill and his family; and Claudia J., LP, created for the benefit of Claudia and her family (collectively, family limited partnerships). Following negotiations as to which partnership would receive each piece of real property, decedent on July 1, 2003, contributed real property to the family limited partnerships in exchange for a 99% limited partner interest in each of the family limited partnerships. On July 16, 2003, decedent executed a partnership agreement for Kel-Tex, LP, and on November 21, 2003, contributed both quarries to Kel-Tex, LP, in exchange for a 99% limited partnership interest.

---

[2]Hereinafter, decedent acted by and through her children as coguardians.

KWC became the general partner and 1% owner of all four partnerships. Each of the partnership agreements provided for an allocation of net income (management fee) to be paid to KWC, the general partner. In return, KWC was "responsible to (1) pay all operating expenses of the Partnership (except interest expense), including but not limited to organizational expenses, legal fees, investment fees, management charges, accounting fees, and other operating costs, (2) manage all of the affairs and business of the Partnership and (3) make all investment decisions of the Partnership". The agreements further provided that the management fee be reviewed yearly and adjusted in a reasonable amount to take into account variations in operating expenses and time necessary to complete the general partner's duties.

On December 15, 2003, decedent contributed various stocks in equal shares to the family limited partnerships. On December 31, 2003, January 1, 2004, and January 1, 2005, decedent gave partnership interests to the children and their descendants. Decedent reported the gifts of partnership interests on Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Return, relating to 2003, 2004, and 2005. After creation of KWC and the family limited partnerships, all of decedent's personal expenses were paid by funds from her guardianship account.

The children sought to determine a reasonable management fee. They delineated a job description providing that the primary duty and responsibility of KWC's management was to "[o]versee and undertake all responsibility for the proper management of" the limited partnerships. The duties included: communicating with directors, recommending ways to maximize efficiency and productivity, inspecting properties, overseeing property maintenance, managing rental properties, maintaining records, ensuring taxes are filed and paid, and performing other related duties. To determine an appropriate management fee, the children consulted banks' trust departments (i.e., providing them with the aforementioned job description) and spoke with business leaders in the community. The children found that management fees ranged from 1.2% to 2% of the partnerships' net asset value. Rabun County Bank quoted a fee of 1.1%. Considering the quoted fees, job description, and anticipated income and expenses of the family limited partnerships, the children decided on a 0.7% fee for 2004 and a 1.0% fee for 2005. KWC used the management fee to pay its expenses including taxes, insurance, salaries, maintenance, professional fees, and other administrative costs.

Each of the children provided services to KWC. Bill performed maintenance responsibilities (e.g., lawn care, road and roof repair, and painting)

and hired professionals when necessary. Claudia prepared financial reports and compiled information for the certified public accountant. Betty took care of day-to-day duties such as collecting the mail, depositing and writing checks, interacting with lawyers, banks, and insurance agents, and responding to correspondence. The children also organized family work days to perform maintenance such as floor repair of a rental home and thorough cleaning of the waterfall property. Collectively they worked 60 to 80 hours per week to manage and maintain the properties, met regularly as officers and directors of KWC, and kept minutes of those meetings. At the meetings the children discussed inspections of properties, determined needed repairs, approved budgets, examined maintenance estimates, and reported the financial status of all entities. For their work, KWC paid each of the children an annual salary of $21,600.

On March 17, 2005, decedent, a resident of Georgia, died. Decedent's will was probated in Georgia and the children were appointed coexecutors of decedent's estate. At her death decedent owned none of Betty K, LP; 33.8837% of Claudia J, LP; 35.2808% of WTK, LP; 99% of Kel-Tex, LP; and all 1,500 shares of KWC. On June 17, 2005, the children and their spouses signed a third settlement agreement which further equalized the children's shares of decedent's estate. On December 9, 2005, the children, as coexecutors, timely filed decedent's

Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. On that return, the estate reported decedent's ownership interests in Claudia J, LP, WTK, LP, Kel-Tex, LP, and KWC.

In a notice of deficiency issued to the estate dated August 6, 2008, respondent determined a $2,205,392 deficiency. The deficiency was based on respondent's determination that the value of the assets contributed to the partnerships is includable in decedent's gross estate.

OPINION

Decedent transferred property to the limited partnerships and thereafter transferred partnership interests to her heirs. We analyze each transfer in turn.

I. Transfer of Assets to Partnerships

A gross estate does not include the value of property transferred for full and adequate consideration in money or money's worth. Sec. 2036(a). Decedent's transfers[3] of assets to limited partnerships meet this bona fide sale exception because decedent had legitimate and significant nontax reasons for creating the limited partnerships and received partnership interests proportionate to the value of

---

[3]Each of decedent's contributions to the partnerships is a "transfer" for purposes of sec. 2036. See Estate of DiMarco v. Commissioner, 87 T.C. 653, 662-663 (1986).

the property transferred. Estate of Bongard v. Commissioner, 124 T.C. 95, 118 (2005).[4]

As evidenced by the three settlement agreements, two of which were signed long before the superior court petition was drafted, decedent's primary concern was to ensure the equal distribution of decedent's estate thereby avoiding litigation. In addition, decedent was legitimately concerned about the effective management and potential liability relating to decedent's assets. Probate court approval was required for basic day-to-day management decisions. By contributing the quarries and other properties to partnerships, decedent limited her liability and reduced her management responsibilities. Through KWC, the children were able to manage the properties as individuals rather than as coguardians. Decedent's ownership of two quarries, the waterfall property, the post office, and multiple rental homes required active management and would lead any prudent person to manage these assets in the form of an entity.

---

[4]Pursuant to sec. 7491(a), the estate has the burden of proof unless it introduces credible evidence relating to the issue that would shift the burden to respondent. See Rule 142(a). Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

The superior court petition references estate tax savings upon implementation of the plan, but there is no evidence that tax savings motivated decedent. Prior to hiring Mr. Stewart, the children had not considered tax ramifications. Decedent's primary motives were to ensure effective property management and equal distributions among the children--not minimization of tax liability. Decedent had valid nontax reasons to contribute property to the limited partnerships. Furthermore, decedent received partnership interests equal in value to the assets she contributed to the limited partnerships. Estate of Bongard v. Commissioner, 124 T.C. at 118. As stipulated by respondent, decedent's contributions were properly credited to her capital account. Accordingly, the value of the property transferred to the limited partnerships is not, pursuant to section 2036(a), includable in decedent's gross estate.

II. Transfer of Family Limited Partnership Interests to Heirs

Section 2036(a)(1) provides that a decedent's gross estate includes the value of all property interests transferred (other than for full and adequate consideration in money or money's worth) by a decedent during her life where she has retained for life the possession or enjoyment of the property, or the right to the income from the property. Retained enjoyment may exist where there is an express or implied understanding at the time of the transfer that the transferor will retain the

economic benefits of the property. Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979). "The existence of an implied agreement is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property." Estate of Bongard v. Commissioner, 124 T.C. at 129. The retention of a property's income stream after the property has been transferred is "very clear evidence that the decedent did indeed retain 'possession or enjoyment.'" Estate of Hendry v. Commissioner, 62 T.C. 861, 873 (1974) (citing Estate of Linderme v. Commissioner, 52 T.C. 305 (1969)). Decedent's transfers of partnership assets to her heirs do not qualify for the bona fide sale exception because the transfers were gifts.

Respondent contends that the parties had an implied agreement that decedent would continue to enjoy the income from the family limited partnerships. We disagree. Decedent respected the partnerships and KWC as separate and distinct legal entities, observed partnership formalities, and retained sufficient assets for personal needs. Cf. Estate of Reichardt v. Commissioner, 114 T.C. 144, 152 (2000) (holding that implied agreement existed where decedent used partnership's checking account as his own, lived rent free in a home owned by the partnership, and maintained the same relationship with assets before and their transfer); Estate of Paxton v. Commissioner, 86 T.C. 785, 809 (1986) (holding that

implied agreement existed where decedent transferred substantially all assets to trusts); Estate of Hendry v. Commissioner, 62 T.C. at 874 (holding that implied agreement existed where decedent received distributions when and if requested). Decedent paid personal expenses with funds from her guardianship account and the management fee was not used to pay these expenses.

Respondent also contends that the management fee the family limited partnerships paid is an express retention of income by decedent in the partnership interests and that the value of those interests are therefore includable in decedent's gross estate pursuant to section 2036. Respondent fails to cite, and we are unable to find, any authority for respondent's contention. Respondent relies on the following language in the superior court petition:

> Because the ward will own all the outstanding stock in the corporation that will serve as the general partner, the special allocation of net income for the reasonable management charge will insure that the ward will be provided with adequate income to cover the ward's probable expenses for support, care and maintenance for the remainder of the ward's lifetime in the standard of living to which the ward has become accustomed.

If KWC's management fee exceeded expenses and a distribution was made, decedent, as 100% owner of KWC, could have indeed used the distribution for her support and maintenance. The aforementioned language is merely an expression of financial benefits decedent could receive. It is not, however, a legally binding

directive to provide her support and maintenance. To do so would be inconsistent with the partnership agreements and violate the fiduciary duties imposed upon the general partner. General partners "owe fiduciary duties to the limited partners, which the limited partners are entitled to assert." Hendry v. Wells, 650 S.E.2d 338, 346 (Ga. Ct. App. 2007). This fiduciary duty and the contractual terms of the partnership agreements restricted decedent from requiring that the partnerships pay anything more than a reasonable fee to the general partner. See Estate of Rolin v. Commissioner, 68 T.C. 919, 929 (1977), aff'd, 588 F.2d 368 (2d Cir. 1978). The management fee the family limited partnerships paid KWC was reasonable. Indeed, after evaluating both the income and expenses of the entities and fees charged by trust departments, the children selected fees that were lower than the industry standard.

The creation of KWC changed decedent's rights to, and relationships with, the contributed assets. Decedent retained 100% ownership of KWC which, pursuant to the partnership agreements, received a management fee for serving as general partner of the family limited partnerships. In return, KWC provided management and paid expenses including taxes, insurance, salaries, professional fees, repairs, and maintenance. The general partner provided a service (i.e. management) to the partnerships for which the partnerships paid a reasonable

management fee.  The children, in their role as officers and directors, performed an analysis to determine the appropriate fee and held regular officer/director meetings to address the significant, active management the partnerships required.  Cf. Estate of Korby v. Commissioner, 471 F.3d 848, 853 (8th Cir. 2006) (stating that the lack of a management contract, the failure to document management hours, the manner in which payments were made, and the failure of decedent to retain adequate assets in her own name supported rejection of petitioner's contention that payments to decedent's living trust were a management fee), aff'g T.C. Memo. 2005-102 and T.C. Memo. 2005-103.  Furthermore, not only did decedent have a bona fide purpose for creating the partnerships, decedent had a bona fide purpose for creating KWC to manage the partnerships.  Decedent's health prevented her from managing the partnership property, and thus an entity to act as general partner was a natural choice.  The children served as officers and directors of KWC, successfully managed the family business, and avoided potentially divisive intrafamily litigation upon decedent's passing.

Decedent owned 100% of KWC, the value of which was appropriately included in her gross estate.  The payment of the management fee by each of the family limited partnerships to KWC, however, is not, pursuant to section 2036(a)(1), a retention of income which would cause inclusion in decedent's gross

estate of the value of the family limited partnership interests. Decedent did not retain an income stream from the partnership interests. To the contrary, decedent's implementation of the plan changed decedent's rights to, and relationship with, the transferred property. In the resulting entity, decedent indeed had an income interest, but this interest does not trigger the applicability of section 2036. The partnership agreements, which were respected by the parties, called for a payment of income to KWC, not to decedent. In essence, respondent is requesting that the Court disregard KWC's existence, the general partner's fiduciary duty, and the partnership agreements. We will not do so. Decedent did not retain an interest in the transferred family limited partnership interests. Accordingly, the value of these family limited partnership interests will not be included in decedent's gross estate.

Contentions we have not addressed are irrelevant, moot, or meritless. To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.